[Civ. No. 33073. Fourth Dist., Div. Two. June 17, 1985.]

GLEN M. HUMPHREY et al.,
Plaintiffs, Cross-defendants and Appellants, v.
RUSSELL T. FUTTER et al.,
Defendants, Cross-complainants and Respondents.

334

**COUNSEL**

Wynn & Wingfield and Donald G. Wingfield for Plaintiffs, Cross-defendants and Appellants.

Simpson & Simpson and Brian J. Simpson for Defendants, Cross-complainants and Respondents.

## OPINION

**RICKLES, J.**—This is an action and cross-action between adjoining land-owners concerning their common boundary. Plaintiffs Glen M. Humphrey and Magdalena S. Humphrey sued to compel removal of allegedly encroaching structures. Defendants Russell T. Futter and Florence V. Futter cross-complained to quiet title to the disputed area. The pleadings also raised other disputes concerning easements and alleged illegal dumping but they are not issues on appeal. After trial to the court, decision and judgment were rendered quieting title to the disputed area in the Futters. The Humphreys have appealed.

### FACTS

The property in question is located northeast of Cherry Valley and at one time was part of the 400-acre Mile High Ranch owned by Daniel Mauerhan. About 300 acres of the ranch were sold to a man named Stewart. In July 1971 Mauerhan sold about six of the remaining acres, including the ranch house, to the Futters. The balance of the land, about 90 acres on which cherry orchards were located, was leased to the Futters with an option to purchase. Before the sale was completed, Mauerhan and Russell Futter walked the property and Mauerhan pointed out the four corners. Both Russell Futter and Mauerhan testified at trial regarding this event, giving somewhat different accounts.

According to Futter, they walked to the northeast corner of the six-acre parcel along a road bordered by lilacs. At a certain point, Mauerhan parted the branches of the lilacs on the west side of the road and indicated two oak trees, the only oaks anywhere in the vicinity. Mauerhan told Futter to sight along the north side of the trunk of the near tree and the south side of the trunk of the far tree and this line would connect to the south edge of a horseshoe bend in a road near the northwest corner of the property. If Futter stayed on the south side of this sight line, Mauerhan said, he would be on his own property. The adjoining property on the north was the 90-acre parcel which Futter was leasing from Mauerhan.

According to Mauerhan, who was 75 years old at the time of trial, he had himself placed two wooden stakes to mark the north boundary of the property. He had done this using a transit and relying on survey work done in

1969. This survey had provided the legal description of the boundary of the six-acre parcel used in the deed to the Futters. Mauerhan had placed the stakes about nine months before the sale to the Futters. The stakes were slightly north of the two oak trees and a line through the stakes would be parallel to a line through the trees. When he showed the north boundary to Russell Futter, Mauerhan stood at the easternmost stake, between the lilacs and the first oak tree, and sighted across it to the second stake. He told Futter this sight line was the northern boundary of the property the Futters were buying.

Between 1971 and 1973, the Futters erected two structures near the disputed boundary. One was a hundred-square-foot structure, part of a wild west town, called the Wells Fargo building. The other structure was constructed of telephone poles and was used to shelter livestock. In the litigation it has been called the pole barn.

The Futters did not exercise their option to purchase the 90-acre parcel and the lease was terminated. There was litigation between Mauerhan and the Futters regarding damage to the cherry orchard by the Futters' cattle and also regarding the Futters' use of the name "Mile High Ranch." Mauerhan testified there was "bad blood" between himself and the Futters as a result of this litigation.

In 1973 Mauerhan and Russell Futter again discussed the location of the disputed boundary. Their accounts of this event are in all essential respects the same. Mauerhan discovered that the two stakes were gone. Futter said he did not know anything about the stakes. Standing again near the northeast corner of the Futters' property, Mauerhan sighted along the north side of the near oak tree and the south side of the far oak tree. According to this sight line, both the pole barn and the Wells Fargo building encroached to some extent. Mauerhan pointed out the encroachments and told Futter if he stayed south of this sight line through the trees, he would be well on his own property. They discussed the possibility of having a survey done but neither was willing to pay the cost.

After this conversation the Futters tore down the Wells Fargo building but left the pole barn as it was. Mauerhan did not pursue the matter. The area in question is split by deep ravines and therefore unsuitable for cultivation. Because he considered it wasteland and because he found Futter unpleasant to deal with, he gave no further thought to the boundary or the encroachment.

In 1975 the Futters began construction of a 2,500-square-foot residential structure just south of the pole barn. Originally intended as a group home

for children, it was never used for that purpose. In the litigation it has been called the rental house.

Mauerhan sold the 90-acre parcel to the Ruhling Family Trust which in turn, in 1978, sold it to the Humphreys.

In late 1978 the Futters hired a surveyor to prepare a parcel map for a proposed lot split. The surveyor discovered that a monument near the southeast corner of the property, an imbedded metal pipe, was out of position. When this was corrected and the north boundary was drawn according to the legal description in the Mauerhan-Futter deed, the boundary was found to pass through the rental house. Approximately one-third of the rental house and all of the pole barn were north of the boundary as defined in the deed. The Humphreys eventually learned of the surveyor's discovery and brought the present action to compel the removal of all encroachments on their property as defined by the deed description.

At trial, a surveyor provided a legal description of a boundary line drawn through the centers of the two oak trees. The trial court concluded that this constituted an agreed boundary and the rental house was therefore not an encroachment.

## DISCUSSION

█ Plaintiffs contend the evidence at trial was insufficient to establish each of the elements of an agreed boundary. Even if there was an agreed boundary, they add, it could not have been where the trial court found it to be.

█ The elements required to establish title by agreed boundary are: (1) uncertainty as to the true boundary line; (2) an express or implied agreement between adjoining owners to accept a line as the boundary; and (3) acceptance and acquiescence in the line for a period equal to the statute of limitations or until action is taken in reliance on the agreement which would result in substantial loss if the boundary were altered. (*French* v. *Brinkman* (1963) 60 Cal.2d 547, 551 [35 Cal.Rptr. 289, 397 P.2d 1]; *Ernie* v. *Trinity Lutheran Church* (1959) 51 Cal.2d 702, 707 [336 P.2d 525].)

█ The doctrine of agreed boundaries is intended to secure, repose and prevent litigation. Courts look with favor on settlements of boundary disputes by the affected owners and give them conclusive effect when they have been fairly and definitely made. (*Minson Co.* v. *Aviation Finance* (1974) 38 Cal.App.3d 489, 494 [113 Cal.Rptr. 223].)

The Humphreys concede there was uncertainty as to the true boundary but argue, first, that there was no express or implied agreement to accept any particular line as the common boundary. They say there was merely a discussion regarding the approximate location of the boundary rather than an agreement to fix the boundary, which both parties anticipated would be determined at some indefinite future time by a survey.

The crucial discussion was, of course, the one which took place in 1973 between Russell Futter and Daniel Mauerhan. At that time, according to the testimony of both men, they sighted through the oak trees and Mauerhan said Futter would be well on his own property if he stayed south of this line. There was no corresponding agreement that all property north of the line belonged to Mauerhan and in fact Futter was apparently not ready to concede that the pole barn encroached.

We have no doubt that this was an agreement although a somewhat unusual one. No case precisely like it has come to our attention. The agreement had two components: first, Mauerhan renounced all claim to property south of the sighted line and, second, they agreed to leave open the question of title to property immediately north of the line which neither had any plans to use.

Under the circumstances of the case, where the Futters no longer claim property north of the sighted line, the trial court could reasonably disregard the second component and treat the first component as an agreement to fix the boundary. Assuming the other requirements of the agreed boundary doctrine are satisfied, we see no policy objection to enforcing such an agreement in the same manner as simpler and more conventional boundary agreements.

Alternatively, the agreement could be enforced under principles of estoppel. "An owner is presumed to know the boundaries and area of his property. Thus a purchaser of a portion of land may properly rely on the owner's representations as to its boundaries, whether designated by acres or dimensions. If these representations are false, and the grantee relies upon them to his detriment, both the grantor and his successors in interest are estopped from asserting any boundary inconsistent with the grantor's representations." (3 Miller & Starr, Current Law of Cal. Real Estate (1977 ed.) § 21:32, pp. 563-564, fns. omitted.)

Here Mauerhan showed the boundaries to Russell Futter before the purchase by the Futters. Whether one accepts the account given by Futter of a sighting through the oak trees or the account of Mauerhan of a sighting along stakes just north of and parallel to the trees, the representation was

made that all of the land on which the rental house was later built belonged in the parcel which the Futters were purchasing. The Humphreys, as Mauerhan's successors in interest, are estopped from asserting any claim inconsistent with this representation.

■  Next, the Humphreys rely on the supposed rule that acquiescence in a wrong boundary, when the true boundary may be ascertained by survey, is treated as a mistake and neither party is estopped from claiming to the true line.

Although this proposition is supported by some older Court of Appeal decisions, two of which the Humphreys have cited, it has been repudiated by the most recent Court of Appeal decisions and by the decisions of our high court.

"The application of the doctrine of agreed boundary is not precluded by the fact that although it was the intent of the parties to set the boundary along the true section line, their failure to do so was merely the result of mistake. (*Martin* v. *Lopes* [1946], 28 Cal.2d 618, 625 [170 P.2d 881].) Similarly, the doctrine is applicable where it is shown that both parties lack the knowledge of where the line actually was. (*Id.*, at p. 626.) Nor is it material that the true boundary line could have been ascertained by a proper survey. (*Id.*)" (*Minson Co.* v. *Aviation Finance, supra*, 38 Cal.App.3d at p. 495. Accord: *Ernie* v. *Trinity Lutheran Church, supra*, 51 Cal.2d at pp. 707-708; *Mello* v. *Weaver* (1950) 36 Cal.2d 456, 462 [224 P.2d 691]; *Kunza* v. *Gaskell* (1979) 91 Cal.App.3d 201, 209 [154 Cal.Rptr. 101]; *Zachery* v. *McWilliams* (1972) 28 Cal.App.3d 57, 61-62 [104 Cal.Rptr. 293].)

■  Next the Humphreys argue that marking or building up to the agreed boundary is a necessary element which was not established here.

"The authorities are in conflict on the question of whether the property must actually be occupied up to the agreed line. Numerous cases have indicated that it is essential that the property be occupied up to the agreed boundary for the period required for adverse possession. However, the most recent Supreme Court expressions of the general rule respecting agreed boundaries do not include such occupation as an essential element of the rule's applicability. In addition, two recent appellate court cases have, by dictum, questioned whether such occupancy is required. However, since, in all of these cases there was, in fact, actual occupancy of the disputed area, the question must be considered as still unanswered in California." (3 Miller & Starr, Current Law of Cal. Real Estate, *supra*, § 21:30, p. 561, fns. omitted.)

The evidence here showed that the Futters, after the boundary agreement, constructed the rental house in what is now the disputed area. Assuming there is some form of occupancy requirement, it was satisfied here by construction and use of the rental house. (See *Aborigine Lumber Co.* v. *Hyman* (1966) 245 Cal.App.2d 938, 943 [54 Cal.Rptr. 371].)

The Humphreys question whether there was acceptance and acquiescence in the agreed boundary for a period equal to the statute of limitations. Here, the agreement was made in 1973 and the boundary was not questioned until 1981, well beyond the five-year period. Examination of the Humphreys' argument in this regard reveals it to be merely a repetition of points urged earlier in support of the position that there was no actual agreement and therefore no further reply is necessary.

■  Next the Humphreys maintain the agreement is unenforceable because the agreed boundary cannot be identified on the ground with reasonable certainty.

At the trial, the Humphreys' attorney asked a witness, a surveyor, whether a sighting along the north side of one oak tree and the south side of the other would yield a definite line or whether the line would vary depending on how far back the viewer stood from the first tree. The surveyor at first resisted the idea that the line would vary. He stated, quite sensibly, that there could be only a single line because the trunks would provide two reference points and only one line may be drawn through two points. Eventually, in the face of repeated questioning, the surveyor allowed that the angle of view would be narrower the farther back the viewer stood and this might have some slight effect on the sighting. From this testimony the Humphreys urge us to draw the conclusion that the agreed line defined by sighting through the oak trees cannot be ascertained on the ground with reasonable certainty.

We reject the argument. First, the testimony indicated approximately where the sighting occurred and we need not be concerned with what the sighting would have been had the viewers been in some other location. Second, all that is required is reasonable certainty, not precision, and the variation caused by changes in the angle of view was not shown to be significant. Third, there was evidence of two additional reference points, the pole barn and the horseshoe bend in the road. Both of these reference points were still available and permitted establishment of the agreed boundary with reasonable certainty.

■  The Humphreys assert the judgment is erroneous because it imposed a boundary different from the agreed boundary. The agreed boundary was

obtained by sighting along the north side of one oak tree and the south side of the other whereas the boundary imposed by the judgment follows a line through the center of the trunks of the two trees and terminates at a point slightly west of the rental house, from which another line proceeds in a southwesterly direction to connect up with the northern boundary as described in the deed.

This objection should have been raised in the trial court and should have been accompanied by an alternative legal description. The Humphreys did not do so. It is hardly fair to criticize the trial court for adopting the only description of the agreed boundary available.

In any event, the objection is not well taken. Both Daniel Mauerhan and Russell Futter testified that the sight line along the tree trunks passed through the pole barn. According to Futter's testimony, only a small corner of the pole barn encroached north of the line. The line imposed by the judgment passes through the pole barn near its center. This proves that the line is correct even though the surveyor used the centers of the trees rather than the edges of the trunks. Assuming for the sake of argument there was a small error, it was de minimis in light of the nature and value of the disputed land.

The Humphreys are benefited, not injured, by the termination of the agreed boundary at a point just west of the pole barn and rental house. By dropping down to the deed boundary rather than extending the agreed boundary all the way to the northwest corner of the Futters' parcel the judgment gave the Humphreys more land than they would otherwise have received. They may not complain of an error in their favor.

■ Finally, the Humphreys contend they are bona fide purchasers without notice and should not be bound by an oral agreement made before their purchase. The short answer is that an agreed boundary established according to the requirements discussed above is binding on successors in interest because "the line so agreed upon becomes in legal effect the true line." (*Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d at p. 708.) Moreover, the existence of the pole barn and the rental house in what later became the disputed area provided notice of the Futters' claim to that area.

The Futters have requested sanctions against the Humphreys for bringing a frivolous appeal. We do not find the appeal to be frivolous and therefore the request for sanctions is denied.

The judgment is affirmed.

Morris, P. J., and Kaufman, J., concurred.