[No. A043830. First Dist., Div. Two. Mar. 13, 1990.]

ERIC R. ARMITAGE, Plaintiff and Appellant, v.
MICHAEL DECKER et al., Defendants and Respondents.

888

## COUNSEL

Eric R. Armitage, in pro. per., for Plaintiff Appellant.

George O. Benton, Maxell, Allen, Cooper & Manwell, Candace H. Shirley, Thomas P. Kelly, Jr., Anderson, McDonald, Belden & Kelly and Belden, Abbey, Weitzenberg & Kelly for Defendants and Respondents.

## OPINION

**KLINE, P. J.**—Eric R. Armitage appeals from a judgment quieting title to certain property in favor of respondents and awarding damages against him for trespass. Appellant contends that the trial court gave erroneous jury instructions regarding application of the doctrine of agreed boundaries and damages for trespass. We shall affirm the judgment.

### STATEMENT OF THE CASE

On November 21, 1984, appellant filed a complaint against respondents Michael and Joyce Decker and Rudy and Joan Goldstein to establish the boundary line between adjacent landowners and to quiet title, for an injunction to prevent encroachment by trespass and to abate a nuisance, and for prescriptive easement. The cause of action for injunction was based on allegations that respondents had erected fences which encroached onto appellant's property. Respondents' answer denied appellant's claim to the disputed property and sought to have title quieted in their favor. Appellant's application for a preliminary injunction was denied after a hearing on February 1, 1985.

In October 1986, the Deckers sought an injunction against appellant, alleging that he had caused fill to be placed in the drainage course and creek between his property and the Deckers' in the course of the grading and excavation of his property. The court issued an order to show cause and the

parties stipulated that appellant would be enjoined from entering and trespassing on the Deckers' property, except to remove the dirt deposited there and on the disputed strip, and from depositing dirt, foliage, rocks or other substances, or creating encroachments on the Deckers' property pending the hearing then scheduled for October 22. This restraining order was dissolved when the parties failed to appear for the hearing, but the Deckers sought and obtained a second one upon allegations that appellant had not removed all the fill from the channel and that the excavation crew had dumped additional dirt onto the Deckers' property and knocked down a fence between the properties. A preliminary injunction issued on November 10, 1986.

On November 18, 1986, the court granted the Deckers' motion for leave to file a "Supplemental Cross-Complaint" seeking damages and injunctive relief for appellant's trespasses; the pleading was filed on December 2, 1986. Appellant filed a supplemental amended complaint on November 17, 1986.

On January 12, 1987, the Deckers sought to modify the preliminary injunction to require appellant to remove dirt from the Deckers' property and the drainage course and a mound of dirt on appellant's property which was allegedly encroaching and slipping onto the Deckers'. The modification was denied on the ground that the issue was sufficiently addressed by the existing injunction, and appellant was ordered to remove the dirt from the Deckers' property.

A 10-day jury trial began on December 14, 1987. The jury quieted title in favor of respondents as bounded by the deed line and awarded the Deckers $25,000 in compensatory and $1,000 in punitive damages for appellant's trespasses. Appellant's motion for a new trial was denied on February 11, 1988. The court heard the remaining equitable issues on March 18, 1988; appellant's application for a permanent injunction was denied and the Deckers' application for a permanent injunction was granted. Judgment was entered on August 19, 1988 and appellant's notice of appeal was timely filed on October 7, 1988.

STATEMENT OF FACTS

A. *Property Boundaries*

Appellant is the owner of property at 1600 Riebli Road in Sonoma County. The Deckers' property at 3635 Stallion Drive lies to the east of and adjoins appellant's property. The northern boundary of the Deckers' property is Riebli Creek; a drainage ditch runs along and/or near the boundary

with appellant's property. The Goldsteins' property at 3599 Stallion Drive lies south of the Deckers' and east of appellant's, adjoining both.

Appellant purchased his property in April 1979. According to appellant's testimony, he walked the boundaries of the property with the prior owner, Dickson, on several occasions before the purchase. The property was fenced on three sides with barbed wire and on one side with a picket fence. Dickson stated on all three occasions that the picket fence was the boundary of the property. He also said that he had never seen any survey markers, and the two men did not see any when they looked on the ground the length of the fence. Appellant did find two markers after he purchased the property.

The picket fence ran the entire length of the eastern boundary of the property, approximately 1,000 feet, and appeared to have been there a long time because some of the oak trees growing next to the fence had grown into the wire. When appellant first saw it, the fence was standing in all but two places; the portion of the fence separating appellant's property from respondents' was straight and intact.

Two prior owners of the property testified for appellant. David Robert Dickson lived on the property now owned by appellant from 1956 to 1960, inherited the property when his father died in 1976, and sold it to appellant in 1979. Dickson testified that he believed the old picket fence to be the eastern boundary of the property and did not recall seeing monuments on the ground during the time he owned the property. He assumed that the fence was on the deed line but never tried to determine whether the fence line was in fact consistent with the description in his deed. Dickson had never discussed the boundary line with his neighbors to the east and was not aware of any disputes with them over the line. The fence appeared to be straight and to Dickson's knowledge had never been moved or repaired during the time he lived on the property. Dickson's father had maintained an orchard of small trees immediately around his residence, with trees ten or twelve feet or more from the fence and not running along it. During the time Dickson lived on the property, the adjoining owner, Dr. McMillan, kept sheep on the land to the east of the fence. There was a hole in the fence because the two families were close and went to each others' houses frequently.

Edward Riebli testified that he had lived on Riebli Road in Sonoma County from 1906 to the time of trial. The property now owned by appellant had once been part of a 1,335-acre ranch owned by Riebli's family; Riebli inherited the property when his father died in 1950. Riebli testified that the picket fence marked the eastern boundary of his family's ranch. He did not know who built the fence, which was there before he came to the

property; his deed did not refer to the fence but Riebli assumed the fence ran along the line described in the deed. Neither Riebli nor his father had had the property surveyed.

Riebli testified that the property to the east was owned by the Werners from 1906 to 1933. Reibli repaired the fence twice a year during this period. He discussed repairing the fence with Werner, to prevent animals from crossing over the fence line, but the Rieblis took it upon themselves to make the repairs rather than making them at Werner's request. Riebli also discussed maintenance of the fence with Dr. McMillan, who owned the adjoining property after Werner. Riebli and McMillan discussed the fence as being the boundary at the southeast corner of the property but had no other discussions about the fence as a boundary.

In 1982, appellant hired a surveyor, Douglas Donmon, to prepare a parcel map for a subdivision of his property. At this time, appellant learned of additional survey monuments marking a boundary different from the old picket fence. Donmon testified that he located physical monuments in the field at the corners of appellant's property corresponding to the description in appellant's deed. The deed described appellant's property by reference to the deed of a prior owner recorded in 1951; that deed, from Chapman to Strobino, described the eastern line of the property as running southerly along the westerly boundary of the lands of McGrath, a prior owner of respondents' properties to the east. Donmon established the boundary of appellant's property by setting up the line described in these prior deeds. Donmon testified that at least four or five surveyors had surveyed the area of appellant's property since the 1950's; the deeds for appellant's property from 1951 through 1979 all described the same boundaries; and that the monuments referred to in those deeds were the ones Donmon located in the 1982 survey. Donmon testified that the difference between the deed line and the picket fence ranged from two or three feet to ten feet; he did not find a pin in the drainage ditch.

Donmon testified that the picket fence was in good repair in 1982 to within approximately 200 feet of the creek, then deteriorated in condition; south of the creek the fence was also in need of repair, with portions on the ground. When Donmon observed the fence in 1986, it was in worse repair than in 1982.

Rudy Lewis Goldstein testified that he bought his property in 1976 from Jack Clement. Before the purchase, Goldstein walked over the property with his real estate agent and Clement. Portions of the fence were lying on the ground. In pointing out the western boundary of the property, Clement walked to the other side of the fence and showed Goldstein a metal stake in

the ground as the survey marker; the pins at the northwest and southwest corners of the property were both located west of the picket fence. When Goldstein asked Clement why the markers were on the other side of the fence, Clement said he had had a survey done. The marker at the northwest corner was level with the ground; Goldstein repeatedly cleared it as it became buried, and placed a stake in the ground which he could see from the other side of the fence. The monument at the southwest corner of the property was always visible and was also marked by a bright surveyor's flag in a tree nearby.

Michael Decker bought his property in 1983. Decker testified that he was shown around the property by Harry Sullivan, who had owned the property for about 18 months before reconveying it to his grantors, the Jeppsons. On the west side, Sullivan took Decker to the other side of the picket fence and pointed out a surveyor's monument which he indicated was the property corner. Sullivan also indicated that there was another marker at the bottom of the drainage ditch at the northwest corner of the property, although he did not know its precise location. Decker asked Sullivan if the picket fence constituted the property boundary and was told it did not. Large sections of the fence between appellant's and the Goldsteins' properties were on the ground, leaving gaps about 30 feet long.

Sullivan testified that he did not recall showing Decker the monuments when he came to see the property in 1983 but at some time tried to point out the southwest monument. Sullivan and his wife both knew that the fence was not the true boundary because they had seen the survey marker at a different point, but were not disturbed to have the fence where it was because the area was not usable for them.

Both Decker and Goldstein constructed new fences along the line of the survey markers, in the springs of 1984 and 1985 or 1986 respectively. Decker testified that appellant approached him in the spring of 1984, identified himself as a lawyer, and indicated that he wished to take the strip of land between the fence and the survey markers by adverse possession. When Decker began to remove the old fence, appellant wrote him a letter stating his belief that he owned the strip of property under the doctrine of agreed boundaries. Decker ignored the letter and appellant filed the present suit. Goldstein similarly testified that when he began to construct his new fence, appellant introduced himself as an attorney and claimed ownership of the property on which Goldstein was building.

Frederick Browne, a registered civil engineer, was hired by Decker to check the east line on the survey map prepared by Donmon. Browne located all of the markers shown on Donmon's map, as well as a pin down in the

drainage ditch which marked the northwest corner of Decker's property and was not shown on the map. Browne testified that Donmon's survey correctly established the east line of appellant's property and conformed with earlier surveys conducted on that line. The line of McGrath described in the 1951 Chapman/Strobino deed was the east line of appellant's property, and all the deeds as far back as the Chapman/Strobino deed were consistent in their descriptions of the line.

Robert Lewis, president of the North Bay Title Company, testified that respondents are successors in interest to land on the east side of the McGrath line while appellant is a successor in interest to the parcel described in the Chapman/Strobino deed, west of the McGrath line. Because the Chapman/Strobino deed specifically defines the eastern boundary as the line of McGrath, Lewis did not see how anyone claiming under that document could claim property east of the line of McGrath.

## B. *Trespass*

In the summer of 1986, appellant hired a contractor to grade his property, which was at that time mostly unimproved. Fill removed during the grading was placed in a mound or berm immediately along the creek, approximately eight to ten feet high, 20 to 25 feet wide and between 200 and 400 feet long. Vieu, an employee of the contractor, testified that he and appellant jointly decided to create the berm as a means to dispose of the excess dirt without having to haul it away. Appellant did not give specific instructions on how to construct the berm, except that when the contractor stopped at a height of about four feet, appellant said to go higher. Appellant testified that he directed the contractor to place the berm within the surveyed deed line.

Appellant did not obtain a permit before the work on his property began but only after a stop work notice was posted on August 28. A grading plan was approved by Theodore Morrison, chief building official for the county, on September 8, 1986. Appellant testified that the map for the plan was drawn by himself and Morrison, but Morrison testified that he did not know appellant and had not helped prepare the drawing for his plan. The map shows the berm located along the drainage ditch at the eastern deed line; Morrison added a requirement that the berm not encroach into the drainage course. Fill requirements imposed by the building code were also attached to the approved permit, including a setback from the property line of one-half the fill depth; a maximum slope of two horizontal to one vertical, to minimize slope failures; removal of vegetation and topsoil prior to the placement of fill, because such material could cause detrimental settlement; scarifying (scratching the surface of) the ground, to allow a proper

bond between existing ground and new material; and 90 percent compaction of fill.

Although appellant testified that he recalled construction of the berm beginning after he obtained the grading permit, the berm was inspected by Sven Karrman of the county water agency three days before the grading plan was approved. At that time, Karrman observed that a few dozen cubic yards of fill had rolled from the berm into the creek and had to be removed under an ordinance prohibiting unauthorized deposit of materials into waterways. Karrman believed that a county ordinance requiring setbacks for construction of buildings near waterways did not apply in this case, and did not consider the berm to pose a significant danger. Karrman's supervisor, Bob Mayes, felt the setback ordinance did apply to the berm and advised the building department that the berm should be set back from the creek at least 30 feet. Mayes explained that the setback requirement was necessary to protect waterways and allow access for their maintenance.

Decker testified that as the berm grew higher, considerable amounts of dirt slid onto the disputed strip of land between the deed line and the fence and onto the Deckers' property. The preliminary injunction which Decker obtained in November 1986 required appellant to remove the dirt from respondent's property. Decker testified that appellant had not removed any of the dirt, which remained on his property, four to six inches deep over an area of about six feet by twenty feet. Appellant claimed he had removed about five buckets of dirt which settled around the bases of the eucalyptus trees on the Deckers' property and estimated that six to eight wheelbarrows full remained in the disputed strip.

Decker testified that he observed appellant on one occasion operating a bulldozer on top of the berm, pushing brush across the watercourse onto Decker's property and into the back of Decker's henhouse. Decker's eight-year-old daughter was in the henhouse at the time and was upset and frightened, and the back wall of the henhouse was damaged. Appellant acknowledged that a bush crossed over the ditch on this occasion, but testified that it touched the henhouse barely, if at all, and did no damage. A letter from the Deckers' attorney to appellant regarding this incident refers only to debris being pushed onto the Deckers' property and not to Decker's daughter or damage to the henhouse.

According to an employee of the contractor, a county building inspector who inspected the site on March 11, 1987, and the engineer hired by Decker, who observed the berm in June of 1987, the berm had not been compacted as required by the building code. Browne, the engineer, also testified that the berm had a slope exceeding the maximum 2:1 ratio, included vegetation,

and bore no indication of having been scarified. Although some small parts of the berm had been landscaped, there was insufficient vegetation to protect the bank and Browne found serious erosion, especially at the north end of the berm close to the creek. Browne testified that because it was winter and the ground was saturated, a little earthquake or tremor would cause a slide and mud flows, resulting in problems for the Deckers' property. Browne testified that if the berm were to slip and fill the ditch, runoff would cut a new ditch closer to the Deckers' house and possibly through their leach field. This could be prevented by installing a storm drain system, at an approximate cost of $12,000. Browne estimated removal of the berm would cost approximately $15,000. If runoff cut new channels through the leach field, necessary replacement costs would be approximately $10,000.

## DISCUSSION

### I.

### *Appellant Failed to Prove the Elements of the Doctrine of Agreed Boundaries*

Appellant's complaint was based on the theory that he owned the property lying between the true deed line and the old picket fence under the venerable doctrine of agreed boundaries. On appeal, he contends that the jury was improperly instructed with respect to this doctrine.

■ "The elements required to prove title by agreed boundary are: (1) uncertainty as to the true boundary line; (2) an express or implied agreement between adjoining owners to accept a line as the boundary; and (3) acceptance and acquiescence in the line for a period equal to the statute of limitations or until action is taken in reliance on the agreement which would result in substantial loss if the boundary were altered." (*Humphrey* v. *Futter* (1985) 169 Cal.App.3d 333, 338 [215 Cal.Rptr. 178]; *Ernie* v. *Trinity Lutheran Church* (1959) 51 Cal.2d 702, 707 [336 P.2d 525].) The party asserting the doctrine bears the burden of proving each required element. (*Mesnick* v. *Caton* (1986) 183 Cal.App.3d 1248, 1255 [228 Cal.Rptr. 779].)

■ Both the elements of uncertainty as to the true line and agreement to fix a boundary may be inferred from evidence of many years of acceptance of a fence as a boundary. (*Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d at p. 708; *Hannah* v. *Pogue* (1944) 23 Cal.2d 849, 856 [147 P.2d 572]; *Clapp* v. *Churchill* (1913) 164 Cal. 741, 746 [130 P. 1061]; *Vella* v. *Ratto* (1971) 17 Cal.App.3d 737, 740-741 [95 Cal.Rptr. 72].) Thus, proof of long-standing acquiescence in a fence as a boundary may be sufficient to prove an agreed boundary in the absence of proof that the boundary was *not*

created to resolve uncertainty. (*Clapp* v. *Churchill, supra,* 164 Cal. at p. 746.) On the other hand, proof of acquiescence in the existence of a fence without evidence of an agreement to take the fence as a boundary is not sufficient to establish an agreed boundary. (*Drew* v. *Mumford* (1958) 160 Cal.App.2d 271, 274 [325 P.2d 240]; *Dibirt* v. *Bopp* (1935) 4 Cal.App.2d 541, 543 [41 P.2d 174]; see *Clapp* v. *Churchill, supra,* 164 Cal. at p. 746.) Similarly, the mere assumption by an owner on one side of an existing fence or other marker that it in fact marks the boundary is insufficient. (*Mello* v. *Weaver* (1950) 36 Cal.2d 456, 460 [224 P.2d 691]; *Martin* v. *Lopes* (1946) 28 Cal.2d 618, 625; *Clapp* v. *Churchill, supra,* 164 Cal. at pp. 744-747.)

■ As the case law has consistently portrayed the doctrine, the agreed boundary line, once established, becomes in legal effect the true line regardless of its accuracy. (*Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d at pp. 708-709; *Martin* v. *Lopes, supra,* 28 Cal.2d at p. 623.) It has been stated " 'that the agreement as to the line . . . does not operate to convey title to land which may lie between the agreed line and the true line, but that it fixes the line itself and the description carries title up to the agreed line, regardless of its accuracy . . . [and] that "the division line when thus established, attaches itself to the deeds of the respective parties, and simply defines, not adds to, the lands described in each deed," . . . .' " (*Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d at pp. 708-709, quoting *Young* v. *Blakeman* (1908) 153 Cal. 477, 482 [95 P. 888].) Since the critical question is the parties' intent to create a boundary to settle their subjective uncertainty as to the true line, the weight of authority has considered it immaterial that the true line could have been ascertained by a proper survey. (*Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d at pp. 707-708; *Humphrey* v. *Futter, supra,* 169 Cal.App.3d 333, 340, and cases cited therein; *Drew* v. *Mumford, supra,* 160 Cal.App.2d at p. 275.)[1] Once established, an agreed boundary is binding upon parties to the agreement and their successors by subsequent deeds. (*Martin* v. *Lopes, supra,* 28 Cal.2d at p. 623; *Kraus* v. *Griswold, supra,* 232 Cal.App.2d 698, 705.)

■ Appellant raises specific and general objections to the jury instructions on the doctrine of agreed boundaries. Although not presented as such, his chief complaint seems to be that the instructions given tended to empha-

---

[1] It has been stated in some cases that a boundary is considered definite and certain when it can be made certain from the deed. (E.g., *Kraus* v. *Griswold* (1965) 232 Cal.App.2d 698, 706-707 [43 Cal.Rptr. 139]; *Meacci* v. *Kochergen* (1956) 141 Cal.App.2d 207, 212 [296 P.2d 573]; *Williams* v. *Barnett* (1955) 135 Cal.App.2d 607, 612 [287 P.2d 789].) Since the decisions of the Supreme Court and a majority of the Courts of Appeal adhere to the rule that the possibility of accurately surveying the true line is immaterial, however, these cases have been regarded as departures from the established rule. (*Humphrey* v. *Futter, supra,* 169 Cal.App.3d at p. 340; 3 Miller & Starr, Current Law of Cal. Real Estate (1977) § 21.27, p. 557, fn. 11; Annot. (1989) 72 A.L.R.4th 132, § 13(b), p. 174, fn. 13, § 20, p. 182, fns. 16-18.)

size his burden of proof more than the instructions he requested. In essence, appellant's instructions stressed the rule that uncertainty may be inferred from long-standing acceptance of a fence as a boundary; the court's instructions tended to remove the possibility of such an inference by informing the jury only that an *agreement* to fix the boundary could be inferred from such acceptance, that a boundary is considered certain when it can be made certain by survey, and that a property owner is charged with knowledge of public documents affecting title which exist at the time the property is purchased. To the extent the jury instructions as a whole failed to adequately portray the doctrine of agreed boundaries applicable to this case, however, reversal is not required because the evidence was insufficient as a matter of law to establish the elements of the doctrine.

Appellant offered no direct proof that the fence had been built to resolve adjoining owners' uncertainty as to the boundary between their lands. His case depended on the jury inferring uncertainty and agreement from long-standing acquiescence in the picket fence as the boundary. (*Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d at p. 708; *Hannah* v. *Pogue, supra,* 23 Cal.2d at p. 856; *Clapp* v. *Churchill, supra,* 164 Cal. at p. 746; *Vella* v. *Ratto, supra,* 17 Cal.App.3d at pp. 740-741.) Appellant completely failed to establish that the landowners on *both* sides of the fence accepted the fence *as a boundary.*

Appellant presented evidence that prior owners on his side of the fence *assumed* the fence followed the line described by their deeds. According to the testimony of the prior owners, there were no discussions with owners on respondents' side of the fence regarding the fence as a boundary. Dickson, the prior owner of appellant's property, testified that he never discussed the boundary line with his neighbors and was not aware of any disputes over the line. Riebli discussed maintenance of the fence with two owners on the east side of the fence; he discussed the fence as a boundary with one neighbor only with respect to the southeast corner.[2] Absent proof of acceptance of the fence as a boundary by owners on both sides, there was no basis for an inference of uncertainty and agreement. (Compare *Clapp* v. *Churchill, supra,* 164 Cal. 741 [assumption that hedge marked boundary by plaintiffs;

---

[2] Appellant portrays Riebli as having testified that the fence line was taken as the boundary by all parties until Decker's purchase in 1983 and that successive owners all talked about the fence as a boundary. His first record citation is to an examination of Riebli outside the presence of the jury: the cited statements are not evidence and in any case refer only to Riebli's conversations with Werner. The second record citation is to a page reflecting Riebli's testimony that the fence had to be kept in good repair to keep animals from crossing the boundary. This testimony does not support the inference that the fence was accepted as a boundary for purposes of defining deed lines; Riebli's response to a question whether there was conversation specifically directed to the fence being the boundary was stricken and so was not in evidence.

no evidence of agreement with defendants] with *Ernie* v. *Trinity Lutheran Church, supra*, 51 Cal.2d at p. 708 [evidence that adjoining owner acquiesced in substantial improvements encroaching over true boundary for 26 years]; *Vella* v. *Ratto, supra*, 17 Cal.App.3d at 740 [evidence that prior owners on both sides accepted fence as boundary and that parties took title as bounded by fence]; *Kunza* v. *Gaskell* (1979) 91 Cal.App.3d 201, 205 [154 Cal.Rptr. 101] [evidence both sides treated fence as boundary and acquiesced in neighbors' use of land up to fence]; *Zachery* v. *McWilliams* (1972) 28 Cal.App.3d 57, 60-61 [104 Cal.Rptr. 293] [evidence owners on both sides accepted fence as boundary].)

Moreover, respondents presented evidence that owners on their side of the fence did *not* accept the fence as a boundary. Both Decker and Goldstein testified that when they inspected their properties prior to purchase, the prior owners showed them the survey markers on the west side of the fence and said the fence was not the boundary of the property. Sullivan testified that he never believed the fence to be the boundary. While the views of these fairly recent owners are not conclusive as to the intent of the owners at the time the fence was constructed, the fact that owners on the east side of the line were aware of the true boundary tends to rebut any inference that the original owners on that side were uncertain as to the boundary of their property.

Another aspect of this case must be considered as well. The evidence at trial demonstrated that the deeds for all the properties in question described a consistent line as the boundary between appellant's and respondents' properties, and that surveys since the 1950's had established the same line. Appellant, an attorney, purchased his property directly from the prior owner, preparing the deed himself from a form; he did not use the services of a title company, did not inspect the chain of title on the property, and did not attempt to ascertain the boundaries of the property according to the written description. Had he made any attempt to verify the description in his deed, appellant would have learned that the fence was not the true boundary of his property.

"The law should prefer boundaries the legal description sets, or else it is hard to see why such records exist. The doctrine of agreed boundaries should most plausibly come into play when legal records fail to settle a boundary dispute. That failure may occur when records never existed, have been destroyed, or are inaccurate, or when the natural features or surveyors' monuments or corners have changed or vanished. . . . Where no reliable legal description exists, the courts have resort to the agreed boundary doctrine. It is better than nothing. But the law should not employ a residual doctrine, a last legal resort, to dispossess an owner of his land when a legal

means of establishing an accurate boundary lies quite readily and conveniently to hand." (*Mesnick* v. *Caton, supra*, 183 Cal.App.3d at pp. 1256-1257.)

While the views expressed in *Mesnick* are somewhat inconsistent with a strict reading of the agreed boundaries doctrine, they reflect a far better approach to resolution of present day boundary disputes. (See 3 Miller & Starr, Current Law of Cal. Real Estate (Supp. 1987) § 21:27, pp. 171-172, fn. 7.) The doctrine of agreed boundaries arose as a means to settle disputes over boundaries at a time when surveys were notoriously inaccurate and the monuments and landmarks they described often could not be found in later years. (*Hannah* v. *Pogue, supra*, 23 Cal.2d at p. 857; Loeb, *The Establishment of Boundary Lines by Practical Location* (1916) 4 Cal.L.Rev. 179, 179-180.) Given the difficulties of fixing boundaries according to the old surveys, courts properly recognized boundary lines which had served for lengthy periods of time as a practical boundary. (*Hannah* v. *Pogue, supra*, 23 Cal.2d at p. 857.) ■ The purpose of the doctrine of agreed boundaries is " 'to secure repose and prevent litigation.' " (*Mesnick* v. *Caton, supra*, 183 Cal.App.3d at p. 1256, quoting *Minson Co.* v. *Aviation Finance* (1974) 38 Cal.App.3d 489, 494 [113 Cal.Rptr. 223].) The doctrine is based on a policy of giving stability to agreements adjusting a disputed boundary " 'as a method adopted in good faith by the parties themselves to settle the controversy, and because it is the most satisfactory way whereby a true boundary line may be determined, and tends to prevent litigation.' " (*Minson Co.* v. *Aviation Finance, supra*, 38 Cal.App.3d at p. 494, quoting *Loustalot* v. *McKeel* (1910) 157 Cal. 634, 642-643 [108 P. 707].)

■ In more recent times, however, accurate surveys are possible and verifiable recorded deeds are the rule. Indeed, recorded deeds for more than 30 years preceding the trial described a consistent line as the boundary between appellant's and respondents' properties. With the passage of time, direct proof of the intent of those who constructed the fence became impossible; while the fence could have been built to fix a disputed boundary, it could have been built for many other reasons. As recognized in *Mesnick,* to allow the doctrine of agreed boundaries to supercede recorded legal descriptions of the property where, as here, they are fully consistent, would not only destroy the significance of recorded instruments but would foster litigation rather than preventing it. (183 Cal.App.3d at p. 1256.) While the doctrine of agreed boundaries has never been intended to be a means of divesting an unconsenting landowner of his property (*Finley* v. *Yuba County Water Dist.* (1979) 99 Cal.App.3d 691, 700 [160 Cal.Rptr. 423]), this is precisely its effect when used to overcome long-standing accurate legal descriptions of property. In this case, as in *Mesnick,* the doctrine "seems only to have stiffened the resolve to disagree and to litigate, despite a readily

ascertainable, accurate boundary contained in the legal description." (183 Cal.App.3d at p. 1256.)

## II.

### The Instructions on Damages for Trespass Were Proper

 The court instructed the jury as follows: "Where one party has trespassed onto the property of another by depositing dirt and gravel thereon, the injured party may recover cost of removal and restoration or loss of market value, whichever will be the one most appropriate to compensate the injured party for the loss sustained, ordinarily the lesser of the two amounts." This instruction is a correct statement of the law. (*Smith* v. *Cap Concrete, Inc.* (1982) 133 Cal.App.3d 769, 779, fn. 9 [184 Cal.Rptr. 308]; *Heninger* v. *Dunn* (1980) 101 Cal.App.3d 858, 862-863 [162 Cal.Rptr. 104]; *Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 576 [136 Cal.Rptr. 751].)

Appellant contends that the instruction was improper because it allowed the jury to award as damages repair costs which exceeded the value of the property. The cases appellant relies on state that the cost of restoration is the proper measure of damages if it is less than the value of the property prior to the injury, but if the cost of restoration exceeds the value of the property, the value of the property is the proper measure. (See, e.g., *Salstrom* v. *Orleans Bar Gold Min. Co.* (1908) 153 Cal. 551, 558 [96 P. 292]; *Kell* v. *Jansen* (1942) 53 Cal.App.2d 498, 503 [127 P.2d 1033].) As explained in *Heninger* v. *Dunn, supra*, these cases state an adjunct of the rule that damages for tortious injury to property are generally determined as the difference between the value of property before and after the injury: Where there is a total dimunition in value, the plaintiff may not recover more than the preinjury value of the land. (101 Cal.App.3d at p. 863.)

It is clear, however, that dimunition in value is not an absolute limitation on damages. (*Heninger* v. *Dunn, supra*, 101 Cal.App.3d at p. 862.) " 'There is no fixed, inflexible rule for determining the measure of damages for injury to, or destruction of, property; whatever formula is most appropriate to compensate the injured party for the loss sustained in the particular case will be adopted.' " (*Ibid.*, quoting *Basin Oil Co.* v. *Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578, 606 [271 P.2d 122]; *Mozzetti* v. *City of Brisbane, supra*, 67 Cal.App.3d at p. 576; Johns, California Damages (3d ed. 1985) § 6.28, p. 6-32.) Indeed, in some circumstances, recovery of damages exceeding the dimunition in value are appropriate. (*Dandoy* v. *Oswald Bros. Paving Co.* (1931) 113 Cal.App. 570, 572-573 [298 P. 1030] [value of land increased by dumping of earth and soil; restoration cost appropriate mea-

sure of damages to avoid leaving injured party without remedy].) The measure of damages for tortious injury to property is "the amount which will compensate for all the detriment proximately caused thereby . . ." (Civ. Code, § 3333); the cost of repair and restoration and the difference in market value before and after injury are alternate means of achieving this compensation.

Where a plaintiff establishes damages by showing depreciation in the value of real property, courts have held defendants to the burden of coming forward with proof that cost of restoration would be less. (*Herzog* v. *Grosso* (1953) 41 Cal.2d 219, 226 [259 P.2d 429]; *Perkins* v. *Blauth* (1912) 163 Cal. 782, 792-793 [127 P. 50].) ■■■■ ■ It follows that when a plaintiff proves damages by showing the cost of repairs it should be incumbent on the defendant to introduce evidence that the repair costs exceed the value of the property.[3] In the present case, the only evidence presented regarding the value of the Deckers' property was appellant's testimony that the *disputed strip* had "substantial value" and Decker's testimony that it was worth $1,500. No evidence was introduced regarding dimunition in value of Decker's property as a whole by virtue of the berm and deposits on the Deckers' land. (See *Herzog* v. *Grosso, supra*, 41 Cal.2d at p. 226 [damages measured by depreciation in value of property due to defendant's construction of steep and dangerous road].) Accordingly, there is no evidence to support appellant's assertion that the jury awarded damages for repairs in an amount greater than the value of the property.

Additionally, it is impossible to know what portion of the jury's verdict was in fact based on its assessment of the cost of repairs. ■ The jury was also instructed that "[o]nce a cause of action for trespass has been established, the landowner may also recover damages for annoyance and discomfort proximately caused thereby." Appellant suggests this instruction was improper because the case upon which it was based, *Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265 [288 P.2d 507], involved annoyance and discomfort due to noxious fumes, and fumes are not an issue in the present case. *Kornoff* can not be so limited. The general rule is simply that damages may be recovered for annoyance and distress, including mental anguish, proximately caused by a trespass. (*Id.*, at pp. 271-273; *Herzog* v. *Grosso, supra*, 41 Cal.2d at pp. 225-226; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1464, p. 936; Rest.2d, Torts § 929(1)(c).) Here, Decker testified he and his wife suffered distress as a result of having their property line buried under large amounts of dirt, making it appear that one side of their property abuts a quarry, after having spent a long time looking

---

[3]This latter rule governs in cases of injury to personal property. (*Rhodes* v. *Firestone Tire & Rubber Co.* (1921) 51 Cal.App. 569, 574 [197 P. 392]; *Konda* v. *Frumpkin* (1928) 90 Cal.App. 384, 385 [265 P. 955].)

for the best piece of property they could afford. The evidence also supported a conclusion that the Deckers suffered distress due to the spillage of dirt onto their property and the threat of interference with drainage on their property, as well as concern over appellant's operation of the bulldozer on the berm.

■ Appellant next contends that the court erred in instructing the jury that the depositing of dirt or gravel on another's property constitutes a trespass (*Dandoy* v. *Oswald Bros. Paving Co., supra,* 113 Cal.App. 571; *Connor* v. *Grosso* (1953) 41 Cal.2d 229 [259 P.2d 435]); that a trespass continues as long as the deposited material remains on the property; and that one who trespasses deliberately and with malice may be liable for punitive damages. The contention that these instructions should not have been given is based on the assertion that the trespass here was due to washing of silt that was not preventable.

Appellant is correct that liability for trespass may be imposed only if the trespass was intentional, reckless, negligent, or the result of ultrahazardous activity. (*Gallin* v. *Poulou* (1956) 140 Cal.App.2d 638, 645 [295 P.2d 958]; *Dufour* v. *Henry J. Kaiser Co.* (1963) 215 Cal.App.2d 26, 30 [29 Cal.Rptr. 871].) The suggestion that appellant's conduct cannot be the basis of liability because he could not have prevented the injury, however, defies the evidence. Appellant points to a statement by Karrman that it would be impossible to prevent all runoff from an area such as the berm except by covering the entire area with plastic. This statement, made during an examination of the witness outside the presence of the jury, was not evidence. In any case, the suggestion that the trespass onto the Deckers' property could not have been prevented ignores the obvious fact that the berm was constructed in such a way that all runoff would necessarily pass onto the Deckers' property, and that appellant and his agents took no steps to minimize the risk of runoff. The requirements of the building code regarding setbacks, slope, and compacting of fill were all intended to minimize problems caused by earth slippage. By failing to comply with these requirements, appellant clearly acted in disregard of the rights of adjoining owners. Moreover, there is evidence of intentional conduct on appellant's part in creating the deposits on the Deckers' property: Vieu testified that appellant specifically told him to build the berm higher than the four feet the contractor had constructed; appellant himself caused debris to be pushed onto the Deckers' property when he operated the bulldozer atop the berm. These actions were taken, of course, while appellant's action to determine the property boundaries was pending, with full knowledge that the Deckers disputed appellant's view of the property boundary and that the berm was placed with no setback at all from the boundary defined by the deeds.

Finally, appellant's complaints with respect to the instructions on punitive damages are unavailing. Civil Code section 3294 provides for the imposition of punitive damages in cases where the defendant is guilty of "oppression, fraud, or malice." "Malice" is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) Punitive damages may be awarded when a trespass is committed from malicious motives or reckless disregard of the rights of others. (*Goshgarian* v. *George* (1984) 161 Cal.App.3d 1214, 1225 [208 Cal.Rptr. 321].) ■ Three factors are relied upon by the courts to guide review of punitive damages awards: the nature of the defendant's acts in light of the whole record, the amount of compensatory damages, and the wealth of the defendant. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980].) A punitive damages award may be reversed on appeal only if " 'the entire record, when viewed most favorably to the judgment, indicates [that the judgment was] rendered as the result of passion and prejudice. . . .' " (*Id.*, at p. 927, quoting *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 65, fn. 12 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

The jury was properly instructed on punitive damages. Appellant makes no claim regarding the element of malice beyond the suggestion that his trespass could not have been prevented. As has been explained, the evidence amply supports a finding of intentional conduct taken in reckless disregard of the Deckers' rights. ■ Appellant's only specific complaint is that the punitive damages instruction was improper because no evidence was presented at trial regarding his wealth. There is a division among the cases as to whether a plaintiff claiming punitive damages is required to introduce evidence of the defendant's wealth. (Compare *Vossler* v. *Richards* (1983) 143 Cal.App.3d 952, 964 [192 Cal.Rptr. 219] and *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 404 [89 Cal.Rptr. 78, 47 A.L.R.3d 286] [not required] with *People* ex rel. *Dept. of Transportation* v. *Grocers Wholesale Co.* (1989) 214 Cal.App.3d 498, 516 [262 Cal.Rptr. 689], and *Dumas* v. *Stocker* (1989) 213 Cal.App.3d 1262, 1268-1269 [262 Cal.Rptr. 311].) We need not reach this issue, however, because there is evidence in the record from which the jury could have drawn inferences regarding appellant's financial status. The deed for the property interest appellant acquired from Dickson recites that it was given in consideration of the good will and assets of a business located in Petaluma, which appellant testified amounted to approximately $47,000. Since the property was unimproved before 1986, the jury could infer that appellant maintained a residence elsewhere. The jury was also aware that appellant was an attorney with offices in Santa Rosa and in St. Helena. In view of this evidence, the award of $1,000 is not excessive.

■ ■ ■ ■ The judgment is affirmed.[4]

Smith, J., and Benson, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 20, 1990.

---

[4]We decline respondent Deckers' request for costs and attorney's fees under Code of Civil Procedure section 907. Sanctions for the taking of a frivolous appeal should be imposed "most sparingly to deter only the most egregious conduct." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 651 [183 Cal.Rptr. 508, 646 P.2d 179].) Although we have determined this appeal to be meritless, this conclusion is not so indisputable that "any reasonable attorney would agree that the appeal is totally and completely without merit." (*Id.*, at p. 650.)