[No. S034604. Dec. 19, 1994.]

E. JACKSON BRYANT et al., Plaintiffs and Appellants, v.
REED F. BLEVINS et al., Defendants and Respondents.

**COUNSEL**

Adamo & Nevarez and John B. Adamo for Plaintiffs and Appellants.

Pamela Nelson for Defendants and Respondents.

**OPINION**

**GEORGE, J.**—When coterminous landowners are uncertain as to the true location of their common boundary, they may establish that boundary by agreement, pursuant to a legal theory commonly referred to as the "agreed-boundary" doctrine. This case presents the question whether a court should

apply that doctrine to resolve a boundary dispute where available legal records provide a reasonable basis for fixing the boundary and the party relying upon the doctrine fails to establish that uncertainty as to the location of the true boundary led to an agreement between the landowners to create a boundary at an agreed-upon location. We hold that the doctrine is inapplicable under these circumstances. Accordingly, we reverse the judgment of the Court of Appeal, which affirmed the trial court's finding that the doctrine applied to this case.

I.

Plaintiffs E. Jackson and Theressa Bryant and defendants Reed and Jean Blevins own adjoining parcels of real property in Herald, located in a rural portion of southern Sacramento County, east of Galt. The parcels resulted from a division of "Lot 57," a 10.88-acre lot contained within a 1-square-mile tract of land that was divided in 1909 into 64 parcels, each approximately 10 acres in size. Lot 57, the largest lot within the subdivision, is configured as shown in the following diagram (which is not drawn to scale):

The original owners of Lot 57, Sheldon and Melda Brandenburger, also were the developers and subdividers of the entire 64-lot subdivision. The subdivision was surveyed in 1909 and was recorded in 1910. The parties to the present dispute do not dispute the accuracy of the 1909 survey. At the

time the Brandenburgers created the subdivision, they conveyed the west one-half of Lot 57 to the Haak family, plaintiffs' predecessors in interest, and retained the east one-half for themselves.[1] In 1965, the Brandenburgers conveyed the "East one-half" of Lot 57 to Aldridge and Patricia Reynolds who, in turn, conveyed the property to defendants 12 years later, in 1977. Plaintiffs acquired title to the west one-half of Lot 57 in 1986.

Defendants testified they were familiar with the property for many years prior to purchasing it. Mrs. Blevins, who had lived in the area for more than 50 years, recalled having seen the property many times while riding a covered wagon with her family riding-group in the 1950's and 1960's. She recalled from as early as the 1950's seeing barbed wire perimeter fencing in the area, although the particular barbed wire fence dividing Lot 57 apparently was erected by the Reynoldses at some point after they acquired the east half of Lot 57 in 1965. After defendants acquired the property in 1977 from the Reynoldses, who had informed defendants that the barbed wire fence marked the boundary line, defendants replaced the fence with a sturdier, pipe panel fence erected at the same location.

Shortly after purchasing the west one-half of Lot 57, plaintiffs, in the course of laying out a fence line upon the perimeter of their parcel, discovered a discrepancy between the approximately 5.3 acres to which they believed they were entitled (based upon a description on the tax assessor's map depicting Lot 57 as 10.63 acres in size, and divided along a line running between the midpoints of the lot's north and south borders) and the area actually enclosed by the fence, which appeared to be approximately 4.9 acres in size. Defendants were unable to explain the discrepancy. Plaintiffs hired a surveyor, Monty Seibel, the owner of a local surveying business, to identify the true boundaries of the property.

Upon surveying Lot 57, Seibel discovered that the fence erected by defendants, at the same location as the previous barbed wire fence, was not located on the true boundary between the eastern and western halves of the property. In reaching this conclusion, Seibel verified his survey measurements against those set forth on the 1909 subdivision map, finding no significant discrepancies. Employing what he testified was the standard method for locating a property boundary where there has been a subdivision, Seibel identified the location of the boundary separating the parties' parcels

---

[1]Although the deed evidencing the Brandenburgers' conveyance of the west half of Lot 57 to the Haaks is not contained in the record, and therefore its exact language has not been adduced, the parties do not dispute that the Haaks received the west one-half of the parcel. Nor is there any dispute as to the accuracy of subsequent deeds, which are contained in the record and refer to the "west half" of Lot 57.

by dividing Lot 57 into portions of equal area by means of a line drawn parallel to the outside boundary of the first parcel conveyed, that is, a line drawn parallel to the western edge of the west one-half of Lot 57. Defendants did not dispute Seibel's methodology in conducting his survey (which Seibel recorded, pursuant to Business and Professions Code section 8762) or its accuracy, and, in fact, stipulated to the admission in evidence of the survey at trial. As illustrated in the diagram, this survey fixed the true boundary separating the west and east halves of Lot 57 at a line east of the fence defendants had erected—approximately 11 feet east on the south border, widening to approximately 42 feet east at the north border.

Seibel's survey thus identified a strip of land, comprising approximately 0.4 acres, bordered on the east by the true boundary separating the parties' parcels, and on the west by the fence constructed by defendants. The rightful ownership of this strip of land, contested by the parties, is the subject of the present proceedings. When the Reynoldses owned the east portion of Lot 57, they used this land as the site for a septic tank and leach field, in order to service a recreational vehicle parked there. After acquiring title from the Reynoldses, the defendants made similar use of the land, employing it for the additional purposes of siting a horse corral and pasture, a storage trailer, and a woodlot. Defendants regularly trimmed the eucalyptus trees to which the barbed wire fence had been attached, and maintained the property so as to reduce the risk of fire.

After making unsuccessful attempts to persuade defendants to move the location of the fence that divided Lot 57, plaintiffs sued to recover possession of the disputed strip of land, to quiet title, for trespass, and for damages. Defendants cross-complained for declaratory relief to establish the boundaries, to quiet title, for a prescriptive easement, and for damages and fees. After a court trial on the parties' respective claims, the trial court, among other findings, tentatively found *no evidence* to support application of the agreed-boundary doctrine to the facts of the present case, stating, at the conclusion of closing arguments: "[I] don't believe that there has been any testimony . . . to indicate there is any sort of dispute that arose when the persons got together and made an agreed fence." Ultimately, however, despite the absence of such evidence, the trial court found that an uncertainty existed as to the location of the true boundary line, and that an agreement to fix the boundary at the fence also existed, so as to support application of the agreed-boundary doctrine, based upon the long-standing acceptance of, and acquiescence in, the location of the fence. As a consequence, the trial court concluded that, under the agreed-boundary doctrine, defendants should be awarded title to the disputed area up to the claimed boundary fence. The Court of Appeal affirmed as to this issue and, in view of that disposition,

concluded it was unnecessary to reach plaintiffs' remaining challenges to the trial court's findings that defendants had acquired title to a portion of the disputed area based upon a theory of adverse possession, and that defendants were entitled to a prescriptive easement as to the balance of the disputed area. Plaintiffs thereafter sought review from this court.

## II.·

Plaintiffs' contention that the disputed area belongs to them is premised upon the uncontroverted survey performed by Monty Seibel in 1987, which, as noted, was not at variance with either the original subdivision map drawn in 1909, when Lot 57 was drawn and subdivided, or with the undisputed deed descriptions of the respective parcels, each of which refers to the ownership of one-half of Lot 57. Plaintiffs further contend that, in the present era of sophisticated surveying techniques and ready access to legal descriptions of real property aided by computer networks and other modern technology, the justification for the agreed-boundary doctrine, upon which the Court of Appeal relied in concluding the disputed area belonged to defendants, has withered and all but disappeared. Plaintiffs argue that the Court of Appeal's expansive application of the doctrine undermines the significance of legal descriptions and encourages litigation and that, therefore, as a matter of policy, the agreed-boundary doctrine should not apply when the true boundary is objectively certain—that is, when a reliable legal description of the true boundary exists. Accordingly, they urge this court to narrow the application of the doctrine to only those cases in which "legal records fail to settle a boundary dispute." (*Mesnick* v. *Caton* (1986) 183 Cal.App.3d 1248, 1256 [228 Cal.Rptr. 779].)

In response, defendants contend the disputed area rightfully belongs to them, noting that the barbed wire fence separating the parcels had stood for several years without controversy as the apparent boundary between the west and east "halves" of Lot 57. Defendants contend the Court of Appeal correctly held it was reasonable, in view of the long-standing presence of the fence, to infer that the parties' predecessors in interest were uncertain as to the location of the true boundary separating the parcels, and agreed to rely upon the fence as the boundary. Thus, defendants contend, the Court of Appeal properly applied the agreed-boundary doctrine.

As we shall explain, we reject defendants' contentions. In our view, the Court of Appeal adopted an unduly expansive interpretation of the agreed-boundary doctrine and improperly rejected the analysis set forth in other, well-reasoned Court of Appeal decisions that have held the doctrine is not properly applicable in cases, such as this one, in which there is no evidence

that prior owners of adjoining parcels of real property entered into an agreement to resolve a boundary dispute and where available legal records provided a reasonable basis for fixing the boundary. In the present case, because defendants, while relying upon the agreed-boundary doctrine, failed to demonstrate that an uncertainty as to the true boundary line led the prior coterminous owners to agree to fix the boundary separating the parties' respective parcels of real property at the location of the barbed wire fence, we conclude that the Court of Appeal erred in upholding the application of the agreed-boundary doctrine.

Notwithstanding the conclusion we reach in this case, we decline to limit application of the agreed-boundary doctrine to instances in which existing legal records are inadequate to settle a boundary dispute. As previous cases have explained, such an inflexible rule would risk destabilizing long-standing agreements—made in good faith by coterminous property owners in order to resolve uncertainty as to the location of their common boundaries—that might, for any one of several reasons, be at variance with legal property descriptions or survey results. Instead, we reaffirm the vitality of the requirements necessary to establish the applicability of the agreed-boundary doctrine, set forth in *Ernie* v. *Trinity Lutheran Church* (1959) 51 Cal.2d 702 [336 P.2d 525]. (See also *Martin* v. *Lopes* (1946) 28 Cal.2d 618, 624 [170 P.2d 881] [discussing the policy in favor of according stability to boundary agreements adopted in good faith by coterminous landowners and acquiesced in for a period longer than the statutory period of limitations for adverse possession].)

### A.

■ The agreed-boundary doctrine constitutes a firmly established exception to the general rule that accords determinative legal effect to the description of land contained in a deed. One early case thus explains the basis for the agreed-boundary doctrine: "[T]he rule has been established that when such [coterminous] owners, being uncertain of the true position of the [common boundary described in their respective deeds], agree upon its true location, mark it upon the ground, or build up to it, occupy on each side up to the place thus fixed and acquiesce in such location for a period equal to the statute of limitations, or under such circumstances that substantial loss would be caused by a change of its position, such line becomes, in law, the true line called for by the respective descriptions, regardless of the accuracy of the agreed location, as it may appear by subsequent measurements. . . . [¶] . . . [¶] The object of the rule is to secure repose, to prevent strife and disputes concerning boundaries, and make titles permanent and stable. . . . If a measurement is made and the line agreed on and acquiesced in as

required by this rule, it is binding on and applicable to all parties to the agreement and their successors by subsequent deeds." (*Young* v. *Blakeman* (1908) 153 Cal. 477, 481-482 [95 P. 888]; see also *Mello* v. *Weaver* (1950) 36 Cal.2d 456, 459-460 [224 P.2d 691]; *Martin* v. *Lopes, supra,* 28 Cal.2d at pp. 622-627; *Hannah* v. *Pogue* (1944) 23 Cal.2d 849, 856-857 [147 P.2d 572]; 5 Miller & Starr, Cal. Real Estate (2d ed. 1989) Adjoining Landowners, § 14.1, pp. 304-308.)

■ Although the agreed-boundary doctrine is well established in California, our case law has recognized that the doctrine properly may be invoked only under carefully specified circumstances. As this court stated in *Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d 702, 707: "The requirements of proof necessary to establish a title by agreed boundary are well settled by the decisions in this state. [Citations.] The doctrine requires that there be [1] an uncertainty as to the true boundary line, [2] an agreement between the coterminous owners fixing the line, and [3] acceptance and acquiescence in the line so fixed for a period equal to the statute of limitations or under such circumstances that substantial loss would be caused by a change of its position." (*Ibid.*)

In the years since we reiterated in *Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d 702, the requirements of the agreed-boundary doctrine, numerous Court of Appeal decisions have held that the doctrine should not be applied broadly to resolve boundary disputes where there is no evidence that the neighboring owners entered into an agreement to resolve a boundary dispute and where the true boundary is ascertainable from the legal description set forth in an existing deed or survey. (See, e.g., *Armitage* v. *Decker* (1990) 218 Cal.App.3d 887, 902-904 [267 Cal.Rptr. 399]; *Mesnick* v. *Caton, supra,* 183 Cal.App.3d at pp. 1256-1258; *Finley* v. *Yuba County Water Dist.* (1979) 99 Cal.App.3d 691, 698-701 [160 Cal.Rptr. 423].) The common theme of these decisions is a deference to the sanctity of true and accurate legal descriptions and a concomitant reluctance to allow such descriptions to be invalidated by implication, through reliance upon unreliable boundaries created by fences or foliage, or by other inexact means of demarcation.

B.

■ In the present case, because defendants claimed title to the disputed strip of land under the agreed-boundary doctrine, they had the burden of proving each element necessary to establish the agreed boundary, including an agreement between the coterminous landowners to fix their common boundary at an agreed-upon line. Plaintiffs contend defendants failed to meet their burden of proving the existence of such an agreement. The Court of

Appeal rejected this contention and, in doing so, declined to follow the reasoning set forth in a recent decision rendered by another court in *Armitage* v. *Decker, supra,* 218 Cal.App.3d 887. As we shall explain, we conclude the Court of Appeal in the present case erred in rejecting the analysis set forth in *Armitage.*

*Armitage* v. *Decker, supra,* 218 Cal.App.3d 887, like the case before us, involved coterminous landowners whose lots were separated by an old fence. In *Armitage,* the plaintiff's survey, based upon the legal description of the plaintiff's lot set forth in the deed, revealed that the placement of the fence reduced the size of the defendant's parcel by departing from the true boundary between the parties' properties. Claiming ownership of the disputed strip of land on an adverse possession theory, the plaintiff contended he was entitled to the land under the agreed-boundary doctrine. The trial court, rejecting the plaintiff's contention that his land extended to the fence, entered judgment for the defendant. The Court of Appeal affirmed, observing that, although the elements of uncertainty as to the true boundary and agreement to fix a boundary may be inferred from acceptance of a fence as a boundary for many years, the plaintiff was not entitled to prevail, because "proof of acquiescence in the existence of a fence without evidence of an agreement to take the fence as a boundary is not sufficient to establish an agreed boundary." (*Id.,* at p. 900.) Thus, the plaintiff failed to establish his case, because he "offered no direct proof that the fence had been built to resolve adjoining owners' uncertainty as to the boundary between their lands. . . . [¶] . . . Absent proof of acceptance of the fence as a boundary by owners on both sides, there was no basis for an inference of uncertainty and agreement." (*Id.,* at p. 901.)

The court in *Armitage,* like the court in a similar case, *Mesnick* v. *Caton, supra,* 183 Cal.App.3d 1248, observed that strong policy justifications counsel against an expansive application of the agreed-boundary doctrine when a legal description of the true boundary exists: "The doctrine of agreed boundaries arose as a means to settle disputes over boundaries at a time when surveys were notoriously inaccurate and the monuments and landmarks they described often could not be found in later years. [Citations.] Given the difficulties of fixing boundaries according to the old surveys, courts properly recognized boundary lines which had served for lengthy periods of time as a practical boundary. [Citation.] The purpose of the doctrine of agreed boundaries is ' "to secure repose and prevent litigation." ' [Citations.] The doctrine is based on a policy of giving stability to agreements adjusting a disputed boundary ' "as a method adopted in good faith by the parties themselves to settle the controversy, and because it is the most satisfactory way whereby a true boundary line may be determined, and tends

to prevent litigation."' [Citations.] [¶] In more recent times, however, accurate surveys are possible and verifiable recorded deeds are the rule. . . . As recognized in *Mesnick,* to allow the doctrine of agreed boundaries to supersede recorded legal descriptions of the property where, as here, they are fully consistent, would not only destroy the significance of recorded instruments but would foster litigation rather than preventing it. [Citation.] While the doctrine of agreed boundaries has never been intended to be a means of divesting an unconsenting landowner of his property [citation], this is precisely its effect when used to overcome long-standing accurate legal descriptions of property." (*Armitage* v. *Decker, supra,* 218 Cal.App.3d at p. 903.)

In our view, the Court of Appeal in the present case incorrectly dismissed the sound logic set forth in *Armitage.* Although in certain circumstances the long-term acceptance of a fence as a boundary, in conjunction with the other pertinent factors we identified in *Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d 702, properly may support an inference that the coterminous landowners agreed to rely upon the fence in fixing an uncertain boundary, we believe the Court of Appeal erred in concluding that such an inference is warranted in the present case.

A comparison of the facts of the case before us with those underlying *Ernie* v. *Trinity Lutheran Church, supra,* 51 Cal.2d 702, is instructive. *Ernie* involved a property dispute over the ownership of a strip of land, slightly less than one foot wide and one hundred forty feet in length. In 1925, the defendant's predecessor in interest (like the defendant, a church), purchased a parcel of land adjoining the property owned by plaintiff's predecessor in interest. Shortly after having a survey made of the property, the defendant's predecessor constructed a rectory and a cement walkway (with a fence embedded in it) upon the strip of land in question. These improvements remained in place for more than 26 years without objection from the adjoining owner, the plaintiff's predecessor. At some point after purchasing the lot adjacent to the defendant's property, the plaintiff commissioned a new survey of the land, based upon the descriptions set forth in the recorded deeds, and, when that survey indicated the disputed land fell within the description contained in the plaintiff's deed, the plaintiff sued to establish her ownership of that strip. On these facts, the court in *Ernie* held: "It may be inferred that there was an uncertainty as to the true [boundary] at the time the structures were erected [presumably because the defendant's predecessor had a survey conducted immediately prior to construction of the rectory, walkway and fence], which uncertainty was settled by practical location on the ground at that time and was agreed to by the then coterminous owners." (51 Cal.2d at p. 708.) Accordingly, the court in *Ernie* held that the defendant

properly held title to the disputed strip of land under the agreed-boundary doctrine.

In the present case, by contrast, there is no evidence that the original barbed wire fence dividing Lot 57 was erected to resolve uncertainty as to the location of the property boundary that separated the west and east halves of the original lot. The record is silent as to when, or why, the fence was built. Although the presence of the fence since at least 1977 suggests a lengthy acquiescence to its existence (on the part of plaintiffs' predecessors in interest), that circumstance alone did not nullify *Ernie's* other requirements—namely, that there be an uncertainty as to the location of the true boundary when the fence was erected, and an agreement between the neighboring property owners to employ the location of the fence as the means of establishing the boundary. (51 Cal.2d at p. 707.) In the present case, there is no evidence to support the existence of either one of these prerequisites. As the court in *Armitage* explained, when existing legal records provide a basis for fixing the boundary, there is no justification for inferring, without additional evidence, that the prior owners were uncertain as to the location of the true boundary or that they agreed to fix their common boundary at the location of a fence. (218 Cal.App.3d at pp. 901-903.) In view of the significant policy considerations set forth in *Armitage*, the agreed-boundary doctrine should not be invoked under the circumstances of the present case to trump the boundary established by the legal records. (*Id.* at pp. 902-903.)

### C.

We are aware of certain judicial authority, emanating from other jurisdictions, supporting the proposition that a conveyance of the "west half" and "east half" of real property does not necessarily signify that a mathematically equal division has been created, and that therefore such terminology may create an "uncertainty" as to the location of the common boundary of the parcels. Yet these decisions are patently distinguishable from the present case. (See *Brewer v. Schammerhorn* (1958) 183 Kan. 739 [332 P.2d 526, 528] [rejecting an equal mathematical division of 163.69835 acres, where one parcel was described as the "south half" but the previously deeded north parcel was referred to not as the "north half," but as "the North 80 acres precisely"]; *People v. Hall* (1904) 43 Misc. 117 [88 N.Y.S. 276, 279] ["The words 'east half' and 'west half' in a deed, while naturally importing equal division, may lose that effect when it appears that *at the time* some fixed line or known boundary or monument divides the premises somewhere near the center . . . ." (Italics added.)].) In contrast to the parties in the cited decisions, defendants in the present case failed to present any evidence

suggesting that, at the time Lot 57 was subdivided (or at any point thereafter), anything other than an equal division was intended. To the contrary, the uncontroverted testimony of plaintiffs' surveyor was that, in view of the general, unqualified language set forth in the legal descriptions of the properties, the subdivision of the original lot created "west" and "east" halves of *equal* area.[2]

As noted previously, the record contains absolutely no evidence supporting the premise that the barbed wire fence was erected to resolve uncertainty on the part of the parties' predecessors in interest as to the true location of the boundary separating the properties. As others aptly have observed, barriers are built for many reasons,[3] only one of which is to act as a visible boundary between parcels of real property; other considerations include aesthetics, the control of livestock, and the need to constrain young children from wandering too far from a residence. (See generally, *Staniford* v. *Trombly* (1919) 181 Cal. 372, 375 [186 P. 599] [because fence had been built to control cattle, and not as an agreed boundary, the court rejected the defendant's claim to ownership of land based upon the agreed-boundary doctrine]; *Dooley's Hardware Mart* v. *Trigg* (1969) 270 Cal.App.2d 337, 339-341 [75 Cal.Rptr. 745] [where parties testified that a fence located one foot from their common boundary had been erected to comply with a local ordinance and did not result from an agreement to fix an uncertain boundary, the agreed-boundary doctrine did not apply]; see also *Mesnick* v. *Caton*, *supra*, 183 Cal.App.3d at p. 1258; *Finley* v. *Yuba County Water Dist.*, *supra*, 99 Cal.App.3d at pp. 700-701.) Moreover, the precise placement of a fence may be influenced by a multitude of factors, only one of which is the location of one's property line; other considerations include the suitability of the terrain to accept the fence, the presence of nearby landscaping, the skill of the builder, and even the subsequent movement of the fence through disrepair, pressure exerted by livestock, or loss of lateral and subjacent support.

■ Thus, a fence—which, in *Ernie* v. *Trinity Lutheran Church*, *supra*, 51 Cal.2d at page 708, we observed "might in and of [itself] be of an uncertain,

---

[2]Monty Seibel's survey revealed Lot 57 to be *10.88 acres* in size; as noted above, the assessor's map indicated the lot was *10.63 acres* in size. This discrepancy fails to establish that prior owners were uncertain as to the location of their common boundary, or that they agreed to rely upon the barbed wire fence to identify that boundary. Seibel opined that the discrepancy resulted simply from the assessor's not possessing sufficient information as to the location of the true boundary, thus causing the assessor to draw a north-south line at the center of Lot 57 as a matter of "convenience" for *assessment* purposes. An employee of the county tax assessor's office, who testified on behalf of plaintiffs, in substance confirmed this view. Therefore, the discrepancy between Seibel's survey and the county tax assessor's information has no bearing upon defendants' contention that the fence dividing Lot 57 constitutes the actual boundary between the west and east halves of the lot.

[3]See Frost, Mending Wall (1914) ("Before I built a wall I'd ask to know/What I was walling in or walling out.").

temporary or equivocal nature"—is not the type of "substantial structure[]" from which an agreement to accept an agreed boundary reasonably may be inferred in the absence of evidence that uncertainty on the part of the property owners led to their agreement to rely upon the fence as evidence of their common boundary. On the record before us, we conclude that defendants, as the parties invoking the agreed-boundary doctrine as the basis for their claim of title to the disputed strip of land, have not met their burden of proof under the test we set forth in *Ernie*.

Were we to hold that, in the absence of the explicit requirements set forth in *Ernie* v. *Trinity Lutheran Church, supra*, 51 Cal.2d 702, dilapidated—and perhaps meandering—fences constitute a sufficient basis for displacing the legal descriptions set forth in recorded deeds, we would be taking a significant step backward toward the days of unrecorded agreements and frontier justice, thereby injecting added uncertainty into this area of the law and spawning much needless litigation. The expansive interpretation of the agreed-boundary doctrine embraced by the Court of Appeal, and urged by the defendants here, clearly would add unnecessary expense and stress to the prospect of real property ownership in California. By contrast, our affirmation of the doctrine as a narrow theory that, in the absence of compliance with the requirements set forth in *Ernie* v. *Trinity Lutheran Church, supra*, 51 Cal.2d at page 707, may not be relied upon to supersede legal descriptions set forth in deeds, will encourage coterminous landowners to resolve their disputes not by erecting imperfect barriers, "drawing lines in the sand," or hauling neighbors into court, but by resorting to title searches, deed descriptions, and other objectively certain methods that afford the parties a superior opportunity to reach an amicable, nonlitigious resolution of their disputes.

For the foregoing reasons, we reject the Court of Appeal's application of the agreed-boundary doctrine to the facts of this case. In our view, an unduly broad application of the doctrine tacitly encourages a *lack* of due diligence on the part of property owners by tempting them *not* to consult legal descriptions in an effort to reach amicable resolution of their disputes, and instead induces property owners to resort to the courts to resolve their boundary disputes. We should not promote such a potentially litigious alternative. Guided by the principles set forth in *Ernie*, and mindful of the objectively certain legal description of defendants' property and the absence of any evidence suggesting that uncertainty as to the true boundary led to the creation of a "fence-made" agreed boundary, we approve the reasoning set forth in *Armitage* v. *Decker, supra*, 218 Cal.App.3d 887, and hold that defendants have failed to establish the "uncertainty" and "agreement" required in order to establish an agreed boundary.

### III.

The judgment of the Court of Appeal is reversed. Because, in view of its disposition of the agreed-boundary issue, that court did not reach plaintiffs' other challenges to the judgment of the trial court, the case is remanded to the Court of Appeal with directions to address plaintiffs' remaining contentions.

Lucas, C. J., Arabian, J., Baxter, J., and Werdegar, J., concurred.

**MOSK, J.**—I dissent.

The majority concede that the agreed-boundary doctrine applies whether or not there is an available legal document—such as a deed or map—that purports to describe the location of the "true" boundary. (Maj. opn., *ante*, pp. 53-54.) However, they then in effect create two different standards of proof: if a legal description is available, the party asserting the agreed boundary must present direct evidence "that the prior owners were uncertain as to the location of the true boundary [and] that they agreed to fix their common boundary at the location of a fence." (Maj. opn., *ante*, p. 58.) If no legal description is available, the rule that has been recognized and applied in California throughout most of this century—regardless of whether a legal description is available—still applies, namely, that direct evidence of uncertainty and agreement is not necessary because "The court may infer that there was an agreement between the coterminous owners ensuing from uncertainty or a dispute, from the long-standing acceptance of a fence as a boundary between their lands." (*Ernie* v. *Trinity Lutheran Church* (1959) 51 Cal.2d 702, 708 [336 P.2d 525] (*Ernie*); *Mello* v. *Weaver* (1950) 36 Cal.2d 456, 460 [224 P.2d 691]; *Hannah* v. *Pogue* (1944) 23 Cal.2d 849, 856 [147 P.2d 572] [citing earlier cases].) I see no reason for this bifurcated standard of proof; I would continue to apply the well-settled inference of uncertainty and agreement whether or not a legal description is available.

### I

The fundamental issue in this case is which type of boundaries are entitled to more respect under the law: the boundaries to which the adjacent landowners have themselves agreed, or the boundaries assertedly described in legal documents. The agreed-boundary doctrine is intended to give the former priority over the latter. "The object of the [agreed-boundary doctrine] is to secure repose, to prevent strife and disputes concerning boundaries, and make titles permanent and stable" by giving legal effect to boundaries that adjacent landowners have designated by building some physical barrier—

such as a fence—and leaving that physical barrier in place for many years. (*Young* v. *Blakeman* (1908) 153 Cal. 477, 482 [95 P. 888]; see also *Mello* v. *Weaver, supra,* 36 Cal.2d 456, 459-460; *Martin* v. *Lopes* (1946) 28 Cal.2d 618, 622-627 [170 P.2d 881]; *Hannah* v. *Pogue, supra,* 23 Cal.2d 849, 856-857; *Finley* v. *Yuba County Water Dist.* (1979) 99 Cal.App.3d 691, 699 [160 Cal.Rptr. 423].) The doctrine is premised on the belief that the expectations and understandings of adjacent landowners regarding the location of their boundary are vitally important and that courts should defer to these expectations and understandings whenever possible; it does not contemplate that courts should disregard landowners' expectations merely because there is some legal document that purports to place the boundary in some other location. The agreed-boundary doctrine thus reflects the notion expressed by Oliver Wendell Holmes over a century ago that "The first requirement of a sound body of law is, that it should correspond with the actual feelings and demands of the community, . . ." (Holmes, The Common Law (1881) at p. 41.)

The majority's holding guarantees that a contrary result will occur. By requiring direct evidence of uncertainty and agreement in cases in which some document purports to describe the true boundary, the majority are ensuring that in most cases an agreed boundary will not prevail. Often it will be virtually impossible to prove that the individuals who built a physical barrier did so expressly to resolve a dispute about the location of their common boundary; indeed, as in this case, it will often be uncertain who actually constructed the physical barrier, much less whether it was built to resolve a dispute regarding the location of a boundary. (See Backman, *The Law of Practical Location of Boundaries and the Need for an Adverse Possession Remedy* (1986) B.Y.U. L. Rev. 957, 964-965 [direct evidence of agreement is often unavailable because most agreements are oral and the original owners may no longer be in possession, may not remember the agreement, or may not admit they made it].) The majority's holding therefore does much more than modify the subtleties of the standards of proof; it ensures that in most cases deeds and maps will be given priority over agreements long accepted between adjacent landowners. For this reason, in cases in which a legal description is available, the majority's newly created rule turns on its head the central policy underlying the agreed-boundary doctrine, i.e., that agreements between adjacent landowners are entitled to deference.

The majority also put too much faith in legal descriptions. The mere fact that a deed or map contains a legally adequate *written* or *pictorial* description of a boundary does not mean that an actual *physical* boundary assertedly laid out in accordance with that description will so accurately reflect the "true"

boundary that courts should give it priority over the agreed boundary. The degree to which a physical boundary assertedly laid out in accordance with an abstract written or pictorial description in a deed or map reflects the true boundary depends a great deal on the individual who actually marks the physical boundary on the land. Even if this task is performed by a surveyor, both courts and experts in the field acknowledge that the resulting physical boundary may not accurately reflect the true boundary.

Surveying is a profession that depends to a great extent on the skill of the surveyor. (Robillard, Clark on Surveying and Boundaries (6th ed. 1992) p. 23; Brown, Boundary Control and Legal Principles (3d ed. 1986) p. 1.) To perform a legally reliable survey, the surveyor must be skilled in "the science of land measurements, . . . the laws and customs that define the boundaries of real property, and . . . the art of evaluating the evidence needed to prove the location of a boundary." (Brown, Boundary Control and Legal Principles, *op. cit. supra,* at p. 1; see *Killian* v. *Hill* (1990) 32 Ark.App. 25 [795 S.W.2d 369, 370] ["Surveying has been described both as an art . . . and as a science, . . ."].) The surveyor's task is particularly difficult if important landmarks or corner monuments have been "lost" or "obliterated" with the passage of time. (See *Maplesden* v. *United States* (9th Cir. 1985) 764 F.2d 1290, 1291-1292 [noting the distinction between "lost" and "obliterated" corner markers and illustrating the difficulties posed by each]; *Vinyard* v. *Vaught* (1985) 138 Ill.App.3d 641 [92 Ill.Dec. 888, 485 N.E.2d 1131] [illustrating difficulty of procedures for reestablishing obliterated corners]; *Milligan* v. *Milligan* (Me. 1993) 624 A.2d 474 [although deed was not ambiguous, surveys conflicted because of missing monument]; Robillard, Clark on Surveying and Boundaries, *op. cit. supra,* at pp. 490-578 [discussing at length the complex techniques used to locate missing landmarks and corner monuments]; Brown, Boundary Control and Legal Principles, *op. cit. supra,* at p. 372 [to locate lost monuments a surveyor may need to "interview[] former landowners or parties who have . . . knowledge [of the location of the landmarks], interview[] other surveyors, or examin[e] public records"].)

Even if the surveyor is diligent, he may nevertheless fail to find the correct location of a landmark or corner. (See *Albrecht* v. *U.S.* (10th Cir. 1987) 831 F.2d 196, 199 [sufficient evidence to support finding that surveyor incorrectly marked "meander corners" and "meander lines"]; *Hansen* v. *Stewart* (Utah 1988) 761 P.2d 14, 18-21 (dis. opn. of Howe, Associate C. J.) [illustrating the complexity and uncertainty of the techniques used to locate corners].) For example, one expert cites an instance in which 12 different surveyors located a corner at a particular spot, and only after the 13th surveyor used a metal detector to locate the original corner monument

was it discovered that the corner was in fact some 70 feet away. (Brown, Boundary Control and Legal Principles, *op. cit. supra,* at p. 372.) According to this commentator, such incidents have occurred in every state. (*Ibid.*) In addition, as we have noted, the exact physical locations of a boundary may be uncertain even if the true locations of the landmarks and corners are known. (See *Young* v. *Blakeman, supra,* 153 Cal. 477, 480-481 [When boundary is located a specific distance from a fixed object, "Experience shows that . . . measurements [of that distance], made at various times by different persons with different instruments, will usually vary some-what. . . . If the position of the line always remain[s] to be ascertained by measurement alone, the result [is] that it [is not] a fixed boundary, but [is] subject to change with every new measurement. Such uncertainty and insta-bility in the title to land [is] intolerable."].)

In light of the complexity of the rules of surveying, the skill necessary to apply them correctly, and the possibility that different surveyors will reach different conclusions about the location of a boundary even if there is a precise description of its location in a deed or map, it is impractical to disregard adjacent landowners' long-standing agreements regarding the physical location of the boundary merely because such a document is available. Also, if the boundaries set by surveyors were to be given priority over those agreed to by the landowners, courts and perhaps juries could often be compelled to determine which of two or more conflicting surveys was the most accurate. Both courts and juries have been forced to settle such disputes in the past, and experience reveals it is no easy task. (See, e.g., *Finley* v. *Yuba County Water Dist., supra,* 99 Cal.App.3d 691, 695; *Link* v. *Cole Investment Co.* (1962) 199 Cal.App.2d 180, 182 [18 Cal.Rptr. 441]; *Hansen* v. *Stewart, supra,* 761 P.2d 14, 15 [jury trial devoted solely to identifying the physical location of a single corner].)

II

The majority state that their holding is meant to "reaffirm the vitality" (maj. opn., *ante,* p. 54) of our holding in *Ernie, supra,* 51 Cal.2d 702, 707, that a party asserting an agreed boundary must prove that there was "[1] an uncertainty as to the true boundary line, [2] an agreement between the coterminous owners fixing the line, and [3] acceptance and acquiescence in the line so fixed for a period equal to the statute of limitations or under such circumstances that substantial loss would be caused by a change of its position." Curiously, however, the majority do so by *limiting* the application of our statement in *Ernie* that "The court may infer that there was an agreement between the coterminous owners ensuing from uncertainty or a dispute, from the long-standing acceptance of a fence as a boundary between

their lands." (*Ernie, supra*, 51 Cal.2d 702, 708; see also *Mello* v. *Weaver, supra*, 36 Cal.2d 456, 460; *Hannah* v. *Pogue, supra*, 23 Cal.2d 849, 856 [citing earlier cases].)

I too would reaffirm our holding in *Ernie*; however, I would reaffirm it in its entirety, including the inferences of uncertainty and agreement. These inferences were sound when we announced our decision in *Ernie* in 1959, and they remain sound to this day, whether or not a legal description is available. When an individual erects a physical barrier in approximately the same location as the boundary between his property and that of his neighbor, one of three matters is likely to occur. First, the adjacent landowner may determine that the physical barrier is actually on his own property. Second, the adjacent landowner may erroneously believe that the physical barrier accurately represents the true boundary between the two parcels. Third, the adjacent landowner may not be sure where the true boundary is, but may believe that it is in approximately the same place as the physical barrier.

In the first scenario, the adjacent landowner would almost certainly demand that the barrier be removed; therefore, there would be *no* acquiescence. In the second and third scenarios, the adjacent landowner probably would allow the physical barrier to remain; therefore, there *would be* acquiescence. Accordingly, if there has been long-term acquiescence in the presence of a physical barrier, it is reasonable to infer that, at the time it was built, either the second or third scenario occurred. Under either the second or third scenario, there is sufficient uncertainty regarding the true physical location of the boundary to satisfy the first element of *Ernie*. (See *Nusbickel* v. *Stevens Ranch Co.* (1921) 187 Cal. 15, 19 [200 P. 651] (*Nusbickel*) ["The word 'uncertainty' . . . convey[s] the idea that at the time of the location of the division line neither of the coterminous owners knew the true position of the line on the ground" and the requirement is satisfied if the landowners believe they know where the physical boundary is but are mistaken.]; *Kunza* v. *Gaskell* (1979) 91 Cal.App.3d 201, 209 [154 Cal.Rptr. 101] ["it has been consistently held that a 'dispute or controversy is not essential' to the required 'uncertainty' "]; see also *Ernie, supra*, 51 Cal.2d 702, 708 ["The line may be founded on a mistake."], citing *Nusbickel, supra*, 187 Cal. 15, 19.)

Similarly, in the first scenario there would be no express or implied agreement between the landowners that the physical barrier represented the true physical boundary between the parcels, and the second element of *Ernie* would not be satisfied. However, if the second and third scenarios occur and the adjacent landowner allows the physical barrier to remain, it is reasonable to infer that he has agreed, either expressly or impliedly, that it represents

the true boundary, thereby satisfying the second element of *Ernie*. (See *Kraemer* v. *Superior Oil Co.* (1966) 240 Cal.App.2d 642, 651 [49 Cal.Rptr. 869] ["It is not necessary that the agreement between the parties be an express one. It may be inferred or implied from their conduct, . . ."].)

Of course, the evidentiary force of these inferences will vary depending on the facts of each case. For example, they would be entitled to less weight if the physical barrier was a substantial distance from the true boundary given the size of the parcels. They may also be entitled to less weight if there is evidence that the physical barrier was built for some purpose other than to mark a boundary. (See maj. opn., *ante,* p. 59 [suggesting that a physical barrier may be erected for "aesthetics, the control of livestock, and the need to constrain young children from wandering too far from a residence," and its location may be influenced by "the suitability of the terrain to accept the fence, the presence of nearby landscaping, the skill of the builder, and even the subsequent movement of the fence through disrepair, pressure exerted by livestock, or loss of lateral or subjacent support"].) Finally, these inferences may be less persuasive if the material used to build the physical barrier is not of a type likely to be used to mark a boundary. However, unless there is contrary evidence sufficient to outweigh the evidentiary force of these inferences, they must prevail.

### III

The majority suggest that an "expansive interpretation of the agreed-boundary doctrine . . . clearly would add unnecessary expense and stress to the prospect of real property ownership in California . . . . [and would] encourage coterminous landowners to resolve their disputes . . . by erecting imperfect barriers, 'drawing lines in the sand,' or hauling neighbors into court, [and not] by resorting to title searches, deed descriptions, and other objectively certain methods that afford the parties a superior opportunity to reach amicable, nonlitigious resolution of their disputes." (Maj. opn., *ante,* p. 60) The majority also conclude that such an interpretation would "tacitly encourage[] a *lack* of due diligence on the part of property owners by tempting them *not* to consult legal descriptions in an effort to reach amicable resolution of their disputes, and instead [would] induce[] property owners to resort to the courts to resolve their boundary disputes." (Maj. opn., *ante,* p. 60, italics in original.)

I do not believe that the reading of *Ernie* proposed in part II of this dissent would produce the results described by the majority. If a dispute arises between adjacent landowners regarding the location of their common boundary, they could take one of two steps. First, as the majority seem to suggest,

they could hire a surveyor—or, more likely, each could hire his own surveyor—to determine the "true" location of the boundary based on the descriptions in their respective deeds. If the surveyors agree on the location of the boundary, the dispute would be resolved. As discussed in part I of this dissent, however, each surveyor may reach a different conclusion and neither survey may be accurate. The landowners would then either have to litigate the matter—in which case they would incur substantial legal expenses and the courts would be required to determine which survey is accurate—or reach a settlement, which the landowners could have done in the first place. In either case, the landowners would have incurred the expense of hiring a surveyor to locate the true physical boundary.

Second, the landowners could simply agree to build some physical barrier in a location that reflects a compromise between their respective understandings regarding the physical location of the true boundary. A broad reading of the *Ernie* requirements facilitates such informal dispute resolution by ensuring that the landowners' agreement will be given legal effect even though there is no direct evidence that a dispute and settlement occurred. Under such a rule, the landowners would incur only the expense of building the physical barrier, which may serve a variety of other useful purposes, and would not be forced to incur the additional expense—in the form of legal costs—of making a record of their dispute and agreement so that they or their successors in interest could sustain their burden of proof in court many years in the future. In addition, the landowners' successors in interest would not suffer prejudice because, even without documentation of the dispute and resolution, the presence of a physical barrier would put them on notice of the location of the agreed boundary.

Far from encouraging a "lack of due diligence" or a resort to "frontier justice," the second approach, which the broader reading of *Ernie* facilitates, thus allows adjacent landowners to resolve their disputes easily without resort to attorneys, to surveyors, or to the courts, and ensures that their mutual understanding regarding the location of their boundary, as evidenced by their long-term acquiescence in a physical barrier, will be respected and given legal effect.

IV

In this case, it is undisputed that the physical barrier between plaintiffs' and defendants' property stood in the same location for many years in excess of the applicable statute of limitations, thereby satisfying *Ernie*'s long-term acquiescence requirement. It was therefore reasonable to infer the two remaining *Ernie* requirements—uncertainty and agreement. Notwithstanding

any contrary evidence in the record, the inference of agreement and uncertainty arising from the parties' long-term acquiescence is sufficient to support the judgment. (See *Hannah* v. *Pogue, supra,* 23 Cal.2d 849, 856-857 [inference of agreement and uncertainty arising from long-term acquiescence sufficient to support judgment]; see generally, *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

I would affirm the judgment of the Court of Appeal.

Kennard, J., concurred.