Filed 3/23/16  Sharma v. Tyannikov CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| RUDRA SHARMA et al., | C078238 |
| Plaintiffs and Respondents, | (Super. Ct. No. CV13-740) |
| v. | |
| YELENA TYANNIKOV et al., | |
| Defendants and Appellants. | |

This action involves a boundary dispute between homeowners in a subdivision in West Sacramento.  After owning their home for 15 years, plaintiffs Rudra and Kamla Sharma suspected the fence between their property and their neighbors' was in the wrong place.  They confirmed that suspicion with a survey and approached the neighbors about moving the fence.  When the neighbors refused, the Sharmas brought suit against them--defendants Yelena Tyannikov and her husband Andrey--for trespass, assault, and declaratory relief to establish their rights to the disputed property.  The trial court granted a nonsuit as to the assault claim and the case proceeded to a court trial.  The Tyannikovs

1

asserted the defenses of the agreed boundary doctrine and laches. The trial court found in favor of the Sharmas.

On appeal, the Tyannikovs contend the trial court erred in concluding that neither the agreed boundary doctrine nor laches applied. The Sharmas move to dismiss the appeal and seek sanctions for a frivolous appeal. We affirm the judgment. As we explain, defendants failed to establish uncertainty and agreement to apply the agreed boundary doctrine, and failed to establish prejudice for the defense of laches. We do not, however, find the appeal frivolous.

## FACTUAL AND PROCEDURAL BACKGROUND

The Sharmas live at 3126 Allan Avenue in West Sacramento. They purchased the property in 1998. Next door, separated from the Sharmas' property by a fence, is 3138 Allan Avenue, which Yelena Tyannikov purchased in 2012. From 1998 until 2012, the various owners of the two properties treated the fence as the boundary, each using the property up to the fence line. There was no discussion or agreement between neighbors about the fence or the boundary.

In 2012, the Sharmas planned to build a storage shed in their backyard. Rudra Sharma went to the planning department where he received a map of the properties. When he measured his property in accordance with the map, he discovered the fence was not on the property's legal boundary. He needed the additional space for the storage shed, which he would gain by moving the fence. He hired a surveyor who performed a survey and confirmed the fence was not located on the true boundary between the two properties.

The surveyor reviewed the subdivision map which had been recorded in 1980. The recorded subdivision map was the basis of the legal descriptions in the deeds for the properties, and was based on monuments in the street. The survey disclosed that the fence was not on the line dividing the two properties on the subdivision map, but instead

2

encroached eight feet onto the Sharmas' property at the rear of the yard, and over four feet in front.

Rudra Sharma spoke with Andrey Tyannikov about the fence and offered to move it to the true boundary at his expense. Tyannikov would not allow it; he threatened to "mess up" anyone who tried to move the fence. The Tyannikovs would not allow the fence to be moved without a court order. Sharma told Tyannikov that in walking around the neighborhood he had observed that most houses had access for an RV, but his house did not, which added to his suspicion that the fence was in the wrong place.

In purchasing their house, a large backyard was a priority for the Tyannikovs, for their children to play and to store a trailer that Andrey used in his landscaping business.

The Sharmas brought suit against Yelena Tyannikov and a doe defendant.[1] The complaint stated causes of action for trespass, assault based on Andrey's alleged threats, and declaratory relief to establish the Sharmas' rights to the property.[2]

The Sharmas moved for summary adjudication on the trespass action. The trial court denied the motion, finding triable issues of material fact.

The case proceeded to a court trial. The court granted defendants' motion for a nonsuit on the assault claim, finding threats alone were insufficient to constitute an assault. The defendants asserted two defenses at trial: the agreed boundary doctrine and laches. The trial court rejected both. It found the agreed boundary doctrine did not apply where the boundary was not uncertain. The court found defendants failed to prove the prejudice necessary for laches, concluding that the mere discovery that the amount of

---

[1] Yelena Tyannikov alone held title to the property. The Sharmas did not know Andrey's name. He is described in the complaint as defendant Doe 1, a male resident of Yelena Tyannikov's house and the man Rudra Sharma spoke with about the fence.

[2] The Tyannikovs moved to augment the record on appeal to include the complaint, as well as the parties' trial briefs, all of which had been filed in the trial court but not designated as part of the record on appeal. We grant the unopposed motion.

3

property owned was less than previously thought did not constitute prejudice for purposes of the laches defense.

The court entered judgment in favor of the Sharmas, finding the boundary between the properties was as determined by the survey, and awarding the Sharmas one dollar in trespass damages. It ordered defendants to remove their property, including a metal gate they had installed, from plaintiffs' side of the boundary.

Defendants appealed.

Plaintiffs moved to dismiss the appeal and requested sanctions for a frivolous appeal.

## DISCUSSION

### I

### *Standard of Review*

The parties disagree as to the proper standard of review. Defendants contend our review should be de novo because the issue on appeal is a question of law. They contend the trial court used the wrong legal standards in determining that the agreed boundary doctrine did not apply and the defense of laches did not apply. Plaintiffs contend the proper standard of review is substantial evidence because the trial court found the defenses failed for insufficient evidence.

"[T]he application of the rule to the facts and the consequent determination whether the rule is satisfied" is a mixed question of law and fact. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.) " 'There are three steps involved in deciding a mixed fact/law question. The first step is the establishment of basic, primary or historical facts. The second is the selection of the applicable law. The third is the application of law to the facts. All three trial court determinations are subject to appellate review. Questions of fact are reviewed by giving deference to the trial court's decision. Questions of law are reviewed under a nondeferential standard, affording plenary review.' " (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800.) The

4

standard of review for the third step depends on the nature of the inquiry required. If application of the law to the facts requires an inquiry that is primarily factual in nature, the deferential substantial evidence standard applies; if application of the law to the facts requires an inquiry that is primarily legal in nature, the de novo standard applies. (*Id*. at pp. 800-801; *Apex LLC v. Sharing World, Inc*. (2012) 206 Cal.App.4th 999, 1009.)

Here, the parties agree the facts are largely undisputed. The dispute is over the precise requirements of the defenses of agreed boundary and laches and how those requirements may be proved. We review the trial court's resolution of that dispute de novo, and conclude defendants failed to establish a defense.

II

*Agreed Boundary Doctrine*

A. *The Law*

"The agreed-boundary doctrine constitutes a firmly established exception to the general rule that accords determinative legal effect to the description of land contained in a deed." (*Bryant v. Blevins* (1994) 9 Cal.4th 47, 54 (*Bryant*).) The party claiming the land pursuant to the doctrine bears the burden of establishing that there is "[1] an uncertainty as to the true boundary line, [2] an agreement between the coterminous owners fixing the line, and [3] acceptance and acquiescence in the line so fixed for a period equal to the statute of limitations or under such circumstances that substantial loss would be caused by a change of its position." (*Id.* at p. 55, quoting *Ernie v. Trinity Lutheran Church* (1959) 51 Cal.2d 702, 707 (*Ernie*).)

"The purpose of the agreed-boundary doctrine is to secure repose and prevent litigation. [Citation.] The doctrine promotes the stability of agreements adjusting a disputed boundary as a method adopted in good faith by the parties to settle a controversy. It arose as a way to settle disputes over boundaries in an earlier time, when surveys were notoriously inaccurate and the monuments and landmarks they described could not be located. In more recent times, however, accurate surveys and verifiable

5

recorded deeds are the rule. [Citation.] Where the evidence does not satisfy the requirements of the doctrine, the law should not employ the agreed-boundary doctrine 'to trump the boundary established by the legal records' [citation] and 'to disposses[s] an owner of his land when a legal means of establishing an accurate boundary lies quite readily and conveniently to hand.' [Citation.]" (*Mehdizadeh v. Mincer* (1996) 46 Cal.App.4th 1296, 1304.)

In *Armitage v. Decker* (1990) 218 Cal.App.3d 887 (*Armitage*), plaintiff sought to apply the agreed boundary doctrine to establish that an old picket fence was the true boundary even though it was not built along the boundary set forth in the deed descriptions. The court considered the role of acquiescence in the fence as the boundary line. "Both the elements of uncertainty as to the true line and agreement to fix a boundary may be inferred from evidence of many years of acceptance of a fence as a boundary. [Citations.] Thus, proof of long-standing acquiescence in a fence as a boundary may be sufficient to prove an agreed boundary in the absence of proof that the boundary was *not* created to resolve uncertainty. [Citation.] On the other hand, proof of acquiescence in the existence of a fence without evidence of an agreement to take the fence as a boundary is not sufficient to establish an agreed boundary. [Citations.] Similarly, the mere assumption by an owner on one side of an existing fence or other marker that it in fact marks the boundary is insufficient. [Citations.]" (*Id.* at pp. 899-900.)

The *Armitage* court found insufficient evidence to establish the elements of the doctrine. Plaintiff failed to prove the fence had been built to resolve uncertainty as to the boundary, instead relying on "the jury inferring uncertainty and agreement from long-standing acquiescence in the picket fence as the boundary." (*Armitage, supra,* 218 Cal.App.4th at p. 901.) Plaintiff failed to prove landowners on both sides of the fence accepted the fence as their properties' boundary. (*Ibid.*)

6

The *Armitage* court went on to discuss the policy objectives underlying the doctrine and endorsed the view that gave preference to boundaries set by legal descriptions. It suggested a limited use of the agreed boundary doctrine where recorded legal descriptions permit accurate surveys.**3** (*Armitage, supra,* 218 Cal.App.4th at pp. 902-903.) "[T]o allow the doctrine of agreed boundaries to supercede recorded legal descriptions of the property where, as here, they are fully consistent, would not only destroy the significance of recorded instruments but would foster litigation rather than preventing it. [Citation.] While the doctrine of agreed boundaries has never been intended to be a means of divesting an unconsenting landowner of his property [citation], this is precisely its effect when used to overcome long-standing accurate legal descriptions of property." (*Id.* at p. 903.)

In *Bryant,* our Supreme Court decided "whether a court should apply [the agreed-boundary] doctrine to resolve a boundary dispute where available legal records provide a reasonable basis for fixing the boundary and the party relying upon the doctrine fails to establish that uncertainty as to the location of the true boundary led to an agreement between the landowners to create a boundary at an agreed-upon location. We hold that the doctrine is inapplicable under these circumstances." (*Bryant*, *supra,* 9 Cal.4th at pp. 49-50.) Although the court declined to limit application of the doctrine to situations where existing legal records were inadequate to establish the boundary (*id.* at p. 54), the court refused to apply the doctrine in that case despite long-standing acquiescence in a barbed wire fence as the boundary where the boundary could be determined from legal records. Accepting the reasoning of *Armitage*, the court found the doctrine did not apply where there was an objectively certain legal description and no evidence suggested that

---

**3** Although defendants contend this portion of *Armitage* is merely dicta, our Supreme Court endorsed this policy discussion in *Bryant, supra,* 9 Cal.4th at page 58, as we discuss *post*.

7

uncertainty led to the creation of an agreed boundary of a fence. (*Id.* at p. 60.) "[W]hen existing legal records provide a basis for fixing the boundary, there is no justification for inferring, without additional evidence, that the prior owners were uncertain as to the location of the true boundary or that they agreed to fix their common boundary at the location of a fence. [Citation.] In view of the significant policy considerations set forth in *Armitage*, the agreed-boundary doctrine should not be invoked under the circumstances of the present case to trump the boundary established by the legal records. [Citation.]" (*Id.* at p. 58.)

The *Bryant* court compared the facts in *Ernie, supra,* 51 Cal.2d 702, where the agreed boundary doctrine was applied based in part on acquiescence. There, the dispute was over ownership of a strip of land less than a foot wide and 140 feet in length. Defendant's predecessor, also a church, had constructed a rectory and a cement walkway with a fence imbedded in it on this strip of land, and there had been no objection to these structures for 26 years. (*Id.* at pp. 704, 708.) After plaintiff purchased the lot next to the church, she commissioned a new survey and then claimed title to the strip of land. (*Id.* at pp. 704-705.) Noting that: "The court may infer that there was an agreement between the coterminous owners ensuing from uncertainty or a dispute, from the long-standing acceptance of a fence as a boundary between their lands. [Citation.]" (*id.* at p. 708), the *Ernie* court continued: "It may be inferred that there was an uncertainty as to the true line at the time the structures were erected, which uncertainty was settled by practical location on the ground at that time and was agreed to by the then coterminous owners." (*Ibid.*)

The *Bryant* court read this passage of *Ernie* to infer uncertainty "presumably because the defendant's predecessor had a survey conducted immediately prior to construction of the rectory, walkway and fence." (*Bryant, supra,* 9 Cal.4th at p. 57.) *Ernie* was distinguishable because in that case there was additional evidence of uncertainty and acceptance, beyond mere acquiescence, so the doctrine applied despite

8

the ability to establish the true boundary from recorded legal documents. Further, in *Ernie*, the improvements on the disputed property were more substantial than a fence. "Thus, a fence--which, in [*Ernie*], we observed 'might in and of [itself] be of an uncertain, temporary or equivocal nature'--is not the type of 'substantial structure[]' from which an agreement to accept an agreed boundary reasonably may be inferred in the absence of evidence that uncertainty on the part of the property owners led to their agreement to rely upon the fence as evidence of their common boundary." (*Id.* at pp. 59-60.)

B. *Analysis*

Defendants contend that both the elements of uncertainty and agreement can be inferred from the acquiescence to the fence as the boundary. They rely on portions of statements in *Bryant,* as well as *Ernie* and other pre-*Bryant* cases, and factual distinctions based on the sturdiness of the fence at issue here compared to a barbed wire or picket fence. However, as *Bryant* made clear: "[W]hen existing legal records provide a basis for fixing the boundary, there is no justification for inferring, *without additional evidence*, that the prior owners were uncertain as to the location of the true boundary or that they agreed to fix their common boundary at the location of a fence. [Citation.]" (*Bryant, supra,* 9 Cal.4th at p. 58, italics added.) In *Ernie*, the survey conducted before the rectory and walkway were built provided that additional evidence of uncertainty. There is no such additional evidence of uncertainty here.

Defendants argue uncertainty can be inferred here because, as in *Ernie*, there was a survey before the fence was constructed. At trial, the surveyor testified a survey was required to set the monuments before the property could be subdivided. There is no evidence, however, that the fence was constructed based on that survey. Indeed, as subsequently determined by the Sharmas' survey, which defendants do not dispute, the fence was *not* placed in accordance with the survey subdividing the land. Accordingly,

9

the survey provides no evidence that the fence was intended to clarify and establish an uncertain boundary.

Because there was no evidence to support application of the agreed boundary doctrine in this case, the trial court did not err in rejecting it.

III

*Laches*

Defendants next contend the trial court erred in concluding that the defense of laches did not apply. The trial court found insufficient evidence of prejudice. Plaintiffs argue that they were prejudiced by plaintiffs' delay in seeking to correct the boundary because they detrimentally relied upon the fence as the boundary.

"Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that 'equity aids the vigilant, not those who sleep on their rights.' [Citations.]" (*Magic Kitchen LLC v. Good Things Intern., Ltd.* (2007) 153 Cal.App.4th 1144, 1156.) "The elements required to support a defense of laches include unreasonable delay and either acquiescence in the matter at issue or prejudice to the defendant resulting from the delay. [Citation.] Generally, laches is a question of fact, but where the relevant facts are undisputed, it may be decided as a matter of law. [Citation.]" (*City of Oakland v. Oakland Police and Fire Retirement System* (2014) 224 Cal.App.4th 210, 248.)

Although plaintiffs acquiesced in the location of the fence for many years, defendant points to no evidence that plaintiffs knew the fence was not on the boundary, and we see none. Unknowing acquiescence will not support the defense of laches. " 'Laches is an implied waiver resulting from knowing acquiescence in existing conditions and an inexcusable delay in asserting a right which results in prejudice to the adverse party.' " (*Marriage v. Keener* (1994) 26 Cal.App.4th 186, 191.) " 'Acquiescence, to constitute laches, "must be with the knowledge of the wrongful acts themselves and of their injurious consequences, it must be voluntary, not the result of accident, nor of causes rendering it a physical, legal or moral necessity, and it must last

10

an unreasonable length of time, so that it will be inequitable even to the wrongdoer to enforce the peculiar remedies of equity against him, after he has been suffered to go on unmolested and his conduct apparently acquiesced in." ' " (*Nelson v. Robinson* (1941) 47 Cal.App.2d 520, 531; see *Alexander v. State Capital Co.* (1937) 9 Cal.2d 304, 313; 30 Cal.Jur.3d, *Equity* (2013) § 43, p. 598.)

In asserting prejudice, defendants rely on *Brown v. State Personnel Bd.* (1985) 166 Cal.App.3d 1151, which held at page 1162 that "prejudice may also be established by detrimental reliance by the affected party upon the status quo. [Citations.]"[4] In *Brown*, a university professor was dismissed based on three instances of sexual harassment, two in 1975 and one in 1979. (*Id.* at pp. 1155-1157.) This court found laches barred use of the two earlier incidents. We found prejudice because Brown had relied upon the status quo. In 1976, the tenure committee had advanced Brown to tenure, despite knowledge and discussion of the 1975 incidents, causing him to forego other employment opportunities. (*Id.* at p. 1162.) "The loss of four years at the outset of an academic career is a considerable change of position in reliance upon the status quo. That works a sufficient prejudice to transform the unreasonable delay in this case into the bar of laches." (*Id.* at p. 1163.)

We find *Brown* distinguishable. In *Brown*, the university alone controlled whether the status quo of Brown's continued employment would be changed because of the 1975 allegations of misconduct. Brown was justified in believing the university did not believe the 1975 allegations warranted either investigation or discipline because he was promoted to tenure after the allegations were raised and discussed. It was only the university's

---

[4] Plaintiffs unhelpfully dismiss *Brown* without discussion because it "has nothing whatsoever to do with property or property lines, or purchasing property. Its facts provide no guidance on the application of the laches defense here at all." We disagree because *Brown* does provide guidance on the application of laches, although it is distinguishable.

delay in pursuing the known 1975 allegations of misconduct that caused Brown's detrimental reliance. That is not the case here. Plaintiffs were not aware that the fence was not placed correctly as to constitute an accurate boundary line. While they could have easily ascertained the true boundary, the same is true of defendants. Unlike in *Brown*, the plaintiffs did not control the situation. Had plaintiffs sold their house to another who immediately investigated the true boundary, defendants would have been in the same position as they are now. Any harm to them was not due solely to plaintiffs' delay.

Further, there was no evidence that defendants relied to their detriment on the misplaced fence. They testified a large backyard was important to them, but did not testify they passed over opportunities to purchase other houses with large yards or would not have purchased the house on Allan Avenue if they had known the yard was actually smaller than it appeared.[5] Unlike in *Brown*, we cannot assume that plaintiffs' delay induced defendants to forego other opportunities.

Defendants have failed to show detrimental reliance sufficient to constitute prejudice for purposes of laches. The trial court did not err in rejecting the defense.

IV

*Sanctions for Frivolous Appeal*

Plaintiffs contend defendants' appeal is frivolous because it is "indisputably has no merit." They moved to dismiss this appeal and for sanctions against defendants in the amount of $21,241.25, the amount they spent on costs and attorney fees.

Code of Civil Procedure section 907 and rule 8.276(a)(1) of the California Rules of Court authorize a court of appeal to impose sanctions for a frivolous appeal. "[A]n

---

[5] In an answer to interrogatories, defendants claimed they would not have purchased the house if it had a smaller yard. However, there was no evidence presented at trial on this point.

appeal should be held to be frivolous only when it is prosecuted for an improper motive--to harass the respondent or delay the effect of an adverse judgment--or when it indisputably has no merit--when any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 (*Flaherty*).)

In *Flaherty*, our Supreme Court stressed the difficulty in distinguishing frivolous and nonfrivolous appeals and cautioned that any definition of "frivolousness" must be applied "so as to avoid a serious chilling effect on the assertion of litigants' rights on appeal. Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal. An appeal that is simply without merit is *not* by definition frivolous and should not incur sanctions. Counsel should not be deterred from filing such appeals out of a fear of reprisals." (*Flaherty, supra,* 31 Cal.3d at p. 650.) Sanctions for frivolous appeals "should be used most sparingly to deter only the most egregious conduct." (*Id.* at p. 651.)

Although we have found no merit in defendants' appeal, given the strict standard for imposing sanctions, we do not find the appeal was frivolous. There is no evidence that the appeal was taken for the purpose of harassment or delay, or in bad faith. As to the merits, it appears counsel had a sincere belief in the merits of the appeal and set forth reasoned arguments with citation to authority. Further, plaintiffs' motion for sanctions is lacking. Plaintiffs rely solely on defendants' assertion of the agreed boundary defense, and fail to even mention the laches defense, let alone argue it was frivolous. They fail to address defendants' argument of detrimental reliance as prejudice. We will deny their motion.

## DISPOSITION

The motion to dismiss the appeal and for sanctions is denied.  The judgment is affirmed.  Plaintiffs shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                                                                /s/
                                                 Duarte, J.


We concur:


      /s/
Blease, Acting P. J.


      /s/
Butz, J.

14