Filed 3/20/14  Boulder Skies Ltd. Partnership v. Prazma CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BOULDER SKIES LIMITED PARTNERSHIP et al., <br><br>    Plaintiffs, Cross-Defendants and Respondents, <br><br>    v. <br><br> RICK D. PRAZMA et al., <br><br>    Defendants, Cross-Complainants and Appellants; <br><br> CABRILLO MORTGAGE & REALTY SERVICES, <br><br>    Cross-defendant and Respondent. | D061973 <br><br><br> (Super. Ct. No. 37-2010-00065590-CU-PN-EC) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

The Fox Firm and Melissa J. Fox for Defendants, Cross-Complainants and Appellants.

Goode, Hemme & Peterson and Jerry D. Hemme for Plaintiffs, Cross-Defendants and Respondents.

This case arises out of a boundary and access dispute between adjoining real property owners, plaintiffs and cross-defendants Howard and Rachel Antle (the Antles)[1] and defendants and cross-complainants Rick and Catherine Prazma (the Prazmas).  The Antles prevailed in a court trial on, inter alia, their causes of action to quiet title and for declaratory relief, and on the Prazmas' cause of action for fraud.  The Prazmas appeal, contending the court erred in applying the agreed-boundary doctrine, finding for Howard Antle on the Prazmas' cause of action for fraud and in failing to consider whether Howard Antle made negligent misrepresentations.  We affirm.

BACKGROUND

The two properties are on Manzanita Drive in Descanso, on the eastern edge of the Cleveland National Forest.  The properties adjoin one another at the northern end of the Antles' property and the southern end of the Prazmas' property.  The Antles' property is in the northwest corner of the Descanso Park Terrace subdivision, depicted in subdivision map 1615, which was recorded in 1913.  The Prazmas' property is in the Hulburd Grove subdivision, depicted in subdivision map 1733, which was recorded in 1921.

The property descriptions in the grant deed to the Antles and the grant deeds to the Prazmas and their predecessors in interest show the northern line of Descanso Park

---

[1]  The Antles are partners in plaintiff and cross-defendant Boulder Skies Limited Partnership (Boulder), which holds legal title to the Antles' property.  Cabrillo Mortgage & Realty Services (Cabrillo) is the name of the Antles' real estate business.  When appropriate, Boulder and Cabrillo are included in our references to "the Antles."

Terrace as the border between the two properties. The section line lies just south of that northern line. The surveyor who recorded subdivision map 1733 noted the northern boundary of subdivision map 1615 overlapped the section line and recognized the true boundary was the northern line of map 1615, not the section line.[2] All maps and deeds recorded between 1922 and 2008 recognized the overlap. In the early 1990's, the United States Forestry Service conducted a survey and moved a boundary marker about 10 to 12 feet to the west.

The Antles purchased their property, including the house, from Wally and Bonnie Dollard in 1993 or 1994. At that time, Wally Dollard showed Howard Antle an approximately two-inch iron post in the ground and said it was on the boundary between the Antles' property and the property to the north. Wally Dollard also showed Howard Antle some forestry signs.

The Antles sold the property in 1994, then reacquired it in 1997. After reacquiring the property, Howard Antle noticed a United States government marker in the ground, in approximately "the middle of the western end of [the Antles'] property." The marker was a circular metal cap or post, about three inches in diameter, with numbers printed on it.

---

[2]     A section is "[a m]easure of land; it is one of the divisions employed in a government survey." (II Bowland, Ogden's Rev. Cal. Real Property Law (Cont.Ed.Bar 1975) Glossary, p. 1633.) " 'When California became a state, federal surveyors divided it into a rectangular grid centered around one of three base and meridian landmarks. . . . Each of the townships in the grid is formed by the intersection of township and range lines and is identified by its position relative to [one of] th[es]e central point[s]. . . . A township is approximately 6 miles square and consists of 36 sections, each about a mile square and containing 640 acres.' " (*People ex rel. Brown v. Tehama County Bd. of Supervisors* (2007) 149 Cal.App.4th 422, 434, fn. 7; see generally I Bowland, Ogden's Rev. Cal. Real Property Law (Cont.Ed.Bar 1974) Descriptions, § 14.4, pp. 589-590.)

3

Howard Antle assumed the marker was part of a survey and indicated the western border of his property; the marker lined up with the signs defining that border. The Antles placed a water tank in the northwest corner of their property and built several storages sheds in the northeast corner. The Antles have lived on the property continuously since 1997.

The Prazmas purchased their property in 2003 from Dale Trueax, intending to build a house. At the time of the purchase, Wayne Smith was living on the property in a recreational vehicle parked on one of two graded pads. There were two graded access routes to the property: a driveway crossing the Antles' land (the driveway) and a road controlled by the United States Forest Service (the forest road). . Oak Grove Road provided a third potential access route, but it was ungraded, steep and blocked by oak trees and boulders and therefore impassable.

Howard Antle, who was a licensed real estate broker, represented Trueax in his sale of the property. Howard Antle's listing described the property as "[r]eady to build, driveway graded to existing pad." The listing gave directions to the property, including the statement "R Oak Grove, L Manzanita." The Prazmas followed those directions when they went to view the property, then turned from Manzanita onto the forest road and followed it to one of the graded pads. Trueax and Howard Antle believed the forest road was the access to the property, but Howard Antle did not know whether it was legal access. There was no discussion of Oak Grove Road.

Paul Azzi, the real estate agent representing the Prazmas,[3] presented their offer to buy the property for $150,000. An addendum made the offer "Contingent upon receipt from seller of Certificate of Compliance confirming the legality of the lot for construction of a single family home." Trueax rejected the contingency and, in conformity with Trueax's instructions, Howard Antle presented Azzi a $223,000 counteroffer that stated, "Buyer to determine legality of the property for construction of a single family [home]." Azzi presented a $170,000 counteroffer. Trueax made a $200,000 counteroffer. After Smith told the Prazmas there was another person interested in buying the property, Azzi presented Howard Antle a $210,000 counteroffer that stated "[p]roperty sold 'as is.' " Trueax accepted the counteroffer.

A plat map attached to the August 2003 preliminary title report showed Oak Grove Road as access to the property. Escrow closed and the Prazmas took title in September. They knew before close of escrow that the forest road belonged to the United States Forest Service and use of that road was by permission.

In late 2005 or early 2006, the Prazmas began preparing to build a house. They learned that to obtain a building permit, they had to provide San Diego County written proof they were permitted to use the forest road for access to their property. The Prazmas did not obtain permission from the United States Forest Service. Instead, in early 2006, Catherine Prazma proposed to Howard Antle that the Prazmas be allowed to use the driveway for access. In exchange, the Prazmas would allow the Antles to park their

---

[3]      Azzi was the father-in-law of Catherine Prazma's sister.

vehicles on the Prazmas' property. At the time of the proposal, the Antles were parking their vehicles on the driveway. The Prazmas were living on their property in a recreational vehicle on one of the graded pads and using the forest road.

The Prazmas and the Antles agreed that the Prazmas would be allowed to drive across the Antles' property to reach theirs, and the Antles would be allowed to park a motor home, a trailer and other vehicles on the Prazmas' property, and leave a storage container there. This arrangement lasted until around mid-2009 and the Prazmas ceased using the forest road.

Meanwhile, in January 2008, the Prazmas engaged surveyor James Nicolau III to survey their property and verify markers along the southern boundary. After Nicolau completed his field work, he met with the Prazmas and Howard Antle to report his findings. According to Nicolau, "[s]omething was wrong with map 1733." The section line was the boundary between the Antles' and the Prazmas' properties, and the Antles' house encroached on the Prazmas' property by about two feet. Nicolau believed the Antles' storage sheds, the leach field of their septic system and their water tank also encroached on the Prazmas' property.

The County of San Diego approved Nicolau's survey map and it was recorded as map 20167 in April 2008. Before the recording, Terrence Connors, the San Diego County Surveyor, noted a discrepancy between map 1733 and Nicolau's map. Connors was required to record Nicolau's map because the statutory time for review had elapsed.

The Prazmas assured the Antles the encroachment of the Antles' house would not create a problem between them, but the Prazmas were concerned the encroachment

6

would prevent them from obtaining a building permit. The Prazmas and the Antles discussed various possible accommodations, including a boundary adjustment, a land swap, a land sale and easements, but never reached an agreement. Rick Prazma constructed a log arch over the driveway, with no objection from the Antles.

Howard Antle became concerned about a potential prescriptive rights claim and in February 2009 recorded a notice of consent to use of land (Civ. Code, § 813). He sent the Prazmas a certified letter with a copy of the notice, but the Prazmas never retrieved the letter from the post office. In May Howard Antle sent another letter and notice, which the Prazmas did receive. In June, over Howard Antle's objection, Rick Prazma built a fence and tied it to the arch. The fence prevented the Antles from moving their trash can to the street for trash collection. Howard Antle asked the Prazmas to remove the fence, then untied it and placed it on the ground. Rick Prazma told Howard Antle to remove his vehicles from the Prazmas' property. Howard Antle refused to do so until Rick Prazma took down the arch and told Rick Prazma the Antles' only alternative parking place would block the Prazmas' access. Rick Prazma replied he did not need the access. Catherine Prazma told Howard Antle that the Prazmas would access their property via the forest road, and the Antles should park their vehicles on their own property. Howard Antle parked his vehicles so as to block the Prazmas' access across the Antles' property and connected the vehicles with cable. Rick Prazma threatened to push the Antles' vehicles and storage container with a bulldozer.

7

In July 2009 the Antles engaged surveyor Robert McComb to locate the boundary between the two properties.[4] By August, the Antles had installed surveillance cameras because they felt threatened by Rick Prazma. The Antles informed the Prazmas of the installation. In August the cameras recorded Rick Prazma chaining a vehicle to a tree in the disputed area.

At some point, the Prazmas moved trees and other obstacles from the forest road. The Antles complained to the United States Forest Service that the Prazmas were grading the forest road and damaging forest land. In August 2009 the United States Forest Service ordered the Prazmas to stop using the forest road.[5] In September the surveillance cameras recorded Rick Prazma throwing wood and bags of trash onto the Antles' property. In October Rick Prazma and others cut the cable connecting the Antles' vehicles and pushed the vehicles with a bulldozer. Howard Antle, McComb and others then began erecting a temporary fence along the property line in a position that would block the Prazmas' access to their property via the driveway. Rick Prazma told them to stop, then rammed the fence with a bulldozer or tractor while the Antles were just on the other side. Law enforcement officers arrived and obtained an agreement from Rick Prazma and the Antles that no one would enter the disputed area until a court settled the matter.

---

[4]     McComb specialized in surveying the rural areas of eastern San Diego County known as the back country.

[5]     The Prazmas subsequently used the forest road, and the United States Forest Service did not intervene.

McComb completed his survey and his map was recorded in October 2009 as map 20603. He concluded Nicolau's map was inconsistent with subdivision maps 1615 and 1733 and the property descriptions in the deeds to the Prazmas and the Antles. According to McComb, map 1733 was consistent with map 1615 and showed the northern border of Descanso Park Terrace overlapped the section line, while Nicolau's map showed no overlap and moved the entire Descanso Park Terrace subdivision. McComb's survey placed the property line where Howard Antle had always believed it to be, and he sent the Prazmas a copy of the survey.

During rains in late 2009, grading by Rick Prazma caused water and mud to flow into the Antles' garage and clog their drains. In December the Prazmas demanded that the Antles remove the fence blocking the driveway and move their house, septic system, shed and fence. In late January or early February 2010, Rick Prazma damaged the Antles' fence and broke the pipes to their water tank. Howard Antle straightened out the fence and put it back up, but found the fence down four more times. In February the surveillance cameras photographed Rick Prazma tearing down the fence.

The Antles engaged surveyor Michael Pallamary[6] to review McComb's and Nicolau's surveys. Pallamary concluded McComb's survey was "correct and accurate, and very detailed in addressing . . . the dispute," while Nicolau's procedure was "grossly deficient." According to Pallamary, Nicolau "failed to survey the property that he allegedly was surveying" and failed to disclose that his survey conflicted with the deeds

_____

[6]     Pallamary's surveying practice was largely forensic.

9

and prior surveys.[7] Pallamary believed Nicolau had used as his basis of bearings a marker that was not of record and of unknown origin.

The Antles filed their complaint in February 2010. The Prazmas cross-complained. At trial in September and October 2011, the operative pleadings were the Antles' second amended complaint and the Prazmas' first amended cross-complaint. The court issued its statement of decision in January 2012, entered judgment in February, and denied the Prazmas' motion for a new trial in April.

THE AGREED-BOUNDARY DOCTRINE

The Antles' causes of action to quiet title and for declaratory relief were based on the asserted inaccuracy of Nicolau's survey. In finding for the Antles on those causes of action, the court applied the agreed-boundary doctrine. "The agreed-boundary doctrine constitutes a firmly established exception to the general rule that accords determinative legal effect to the description of land contained in a deed." (*Bryant v. Blevins* (1994) 9 Cal.4th 47, 54.) The doctrine has been described as follows. " '[W]hen . . . [coterminous] owners, being uncertain of the true position of the [common boundary described in their respective deeds], agree upon its true location, mark it upon the ground, or build up to it, occupy on each side up to the place thus fixed and acquiesce in such location for a period equal to the statute of limitations, or under such circumstances that substantial loss would

---

7     Pallamary testified that Nicolau's survey pushed Descanso Park Terrace several feet out of location, pushed the northern boundary of the Antles' property 20 feet to the south, placed Manzanita Road in the Antles' front yard, caused a proportionate 10 to 20 foot shift in every other lot in the subdivision and shifted streets. The trial court "was unpersuaded by" this testimony.

be caused by a change of its position, such line becomes, in law, the true line called for by the respective descriptions, regardless of the accuracy of the agreed location, as it may appear by subsequent measurements.' " (*Ibid.*) Uncertainty regarding the true boundary line may be inferred from circumstantial evidence. (*Vella v. Ratto* (1971) 17 Cal.App.3d 737, 742.) The agreement to fix the location of the line may be express or implied (*French v. Brinkman* (1963) 60 Cal.2d 547, 551), and the existence of an agreement may raise an inference of uncertainty. (*Board of Trustees v. Miller* (1921) 54 Cal.App. 102, 105.) We employ the substantial evidence standard of review to determine whether the trial court properly applied the agreed-boundary doctrine. (*Mehdizadeh v. Mincer* (1996) 46 Cal.App.4th 1296, 1304.)

The Prazmas challenge the court's findings there was "an 'uncertainty' in the true boundary line" and "an agreement . . . to fix the location of the property line." They improperly premise their challenge to the uncertainty finding on the correctness of Nicolau's survey. The correctness of that survey was not established; rather, it was a contested issue at the heart of this dispute. The court found that McComb's survey and his description of the boundary line were "most reasonable" and his "survey more accurately reflect[ed] the common property line . . . than . . . [Nicolau's] survey . . . ." That finding is supported by substantial evidence. (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 263.)

Furthermore, substantial evidence supports the findings of uncertainty and agreement. The uncertainty regarding the boundary between what would later become the Antles' and the Prazmas' properties was noted in 1921 by the surveyor who recorded

11

map 1733. That surveyor remarked that the northern boundary of map 1615 overlapped the section line. All subsequently recorded maps and deeds, except Nicolau's map, agreed the true boundary was the northern boundary of map 1615, not the section line. This constitutes substantial evidence supporting the findings of uncertainty and an agreement fixing the boundary as the northern line of Descanso Park Terrace as reflected in map 1615.

The court did not err in resolving the boundary dispute in the Antles' favor.

FRAUD

The Prazmas alleged fraud by Howard Antle at two separate times. First, "[p]rior to the execution of the sales agreement and continuing through the escrow period" he concealed five matters: (1) the property lacked legal access; (2) the Antles' home encroached on the Prazmas' land; (3) the property was not ready to build; (4) a property line marker had been moved and (5) a large federal cadastral stake (survey marker) clearly marked the property line and the section line. Second, around March 2006, Howard Antle represented to the Prazmas they could access their property permanently via the driveway, in exchange for allowing the Antles exclusive use of a portion of the Prazmas' property. That representation was false because he had no intention of providing a permanent right of access via the driveway.

A cause of action for fraudulent concealment requires a duty to disclose by the person who conceals. (Civ. Code, § 1710, ¶ 3; *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 612-613.) The court here correctly concluded the Antles owed no duty to the Prazmas as adjoining landowners. The only duty arose from

Howard Antle's role as Trueax's real estate broker and that duty was restricted by the purchase agreement. The Prazmas have cited no authority, and we have found none, standing for the proposition that aside from Howard Antle's role as broker, the Antles had a duty to disclose to the Prazmas matters of access, encroachment, boundary or the suitability of the property for building. Furthermore, the purchase agreement "STRONGLY ADVISED" the Prazmas "TO INVESTIGATE THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE PROPERTY" including "property lines, legal or physical access and boundaries including features of the Property shared in common with adjoining landowners, such as walls, fences, roads and driveways . . . and any encroachments . . . ." The purchase agreement stated: "Fences, hedges, walls and other natural or constructed barriers or markers do not necessarily identify true Property boundaries. Property lines may be verified by survey." Additionally, in the first counter offer, the Prazmas "agreed to be responsible 'to determine legality of the property for construction of a single family [home].'" In the fourth counter offer, they agreed the "Property [was] sold 'as is.' " Moreover, the court found Howard Antle credible in his "denial that he was aware of any boundary issues." We will not second guess this credibility finding. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890.)

The court also properly found for Howard Antle on the Prazmas' cause of action alleging a false representation of a permanent right of access. In addition to that cause of action, the Prazmas alleged a cause of action for breach of a contract for access. The court found for the Antles on the breach of contract cause of action and determined the March 2006 "cross-use agreement" was temporary, not permanent. The Prazmas do not

13

challenge the ruling on the breach of contract cause of action, and the court's determination the agreement was temporary is dispositive of the Prazmas' allegation of a false representation regarding access.

The trial court did not err in finding for Howard Antle on the Prazmas' cause of action for fraud.

NEGLIGENT MISREPRESENTATION

The Prazmas' first amended cross-complaint did not allege a cause of action for negligent misrepresentation. The court concluded they had not "adequately pled and thereby provided [the Antles] with a fair opportunity to defend a claim for Negligent Misrepresentation." The Prazmas now contend their cause of action for fraud gave the Antles notice of a claim for negligent misrepresentation based on the concealment of the first four of the five items listed above.

Nothing in the fraud cause of action put the Antles on notice of a claim for negligent misrepresentation; all of the allegations were of intentional misrepresentation. The cause of action alleged a "fraudulent failure to disclose" and alleged the Antles "took certain affirmative actions to insure that [the Prazmas] would not discover the defects" in the property. The cause of action characterized the Antles' alleged misrepresentations as "made for the purpose of inducing the [Prazmas]" to act or fail to act and alleged the Antles intended "not to perform [their] promises." The cause of action sought punitive damages. A cause of action for negligent misrepresentation, on the other hand, requires "(1) a false statement of a material fact that the defendant honestly believes to be true, but made without reasonable grounds for such belief, (2) made with the intent to induce

14

reliance, (3) reasonable reliance on the statement, and (4) damages." (*Century Surety Co. v. Crosby Ins., Inc.* (2004) 124 Cal.App.4th 116, 129.)

The court did not err in concluding that the Prazmas had not adequately alleged a cause of action for negligent misrepresentation.

## DISPOSITION

The judgment is affirmed.

NARES, Acting P. J.

I CONCUR:

HALLER, J.

I CONCUR IN THE RESULT:

IRION, J.

15